919 A.2d 77

**Thomas I. WEEMS, Jr., et al.**

**v.**

**COUNTY COMMISSIONERS OF CALVERT COUNTY.**

**No. 97, Sept. Term, 2006.**

Court of Appeals of Maryland.

March 16, 2007.

L. Teri Spradlin-Dahn, Annapolis, for appellants.

Emanuel Demedis, County Atty., for appellee.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, LAWRENCE F. RODOWSKY, (Retired, specially assigned) and ALAN M. WILNER, (Retired, specially assigned), JJ.

CATHELL, J.

Thomas I. Weems, Jr., M. Linda Weems, George J. Weems, Jr., Thomas Loch Weems, Courtney Weems–Looman, Marsha Wall Taylor, and Fred Taylor, Jr., appellants, (sometimes referred to as Weems) filed a declaratory judgment action in the Circuit Court for Calvert County against the County Commissioners of Calvert County, appellees, with respect to disputes arising out of land located in that County. They sought a declaration as to the westerly terminus of a public easement, a declaration as to the ownership of an area known as Leitch's Wharf, and a declaration that § 15–201 of the Calvert County Code—as it pertains to the property known as Leitch's Wharf—is unconstitutional in that the statute constitutes a taking of the Weems' property without just compensation.

Thus, began the litigation odyssey upon which the parties are embarked. After a decision they deemed adverse to their interests, the Weems appealed to the Court of Special Appeals. There they raised the following issues:

"I. Whether the trial court erred in finding the easement granted to the County in the 1949 deed was ambiguous and that the location of the easement extends to the present day barricade where no competent evidence was presented to show the easement extends past the turnaround described by appellants' witness who had both personal knowledge and expertise in property law, and where his testimony was consistent with a surveyor's letter and photograph entered into evidence.

"II. Whether the trial court erred when it denied appellants' motion to alter or amend judgment and/or for a new trial where appellants attached letters from the sheriff's office and office of the State's Attorney for Calvert County indicating trespassers, when confronted by a Deputy, pre-

sented a copy of § 15–201 of the County Code to justify their use of Leitch's Wharf and the State's Attorney opined that the law is unconstitutional but that his office does not have the power to make a constitutional determination for that conclusion rests with the judiciary.

"III.  Whether the trial court erred when it granted only partial summary judgment to plaintiff/appellants where appellee's opposition to summary judgment contained affidavits from two road workers that did not address the easements and were unresponsive to appellants' affidavits, where the workers had no personal knowledge of the legal status of the road, the deeds or the easement.

"IV.  Whether the trial court erred as a matter of law when it dismissed appellants' request for a declaratory judgment on the constitutionality of § 15–201 of the Calvert County Code.

"Appellants ask this Court in the interest of time and justice to determine the constitutionality of § 15–201 of the Calvert County Code—Where it is undisputed the County easement does not extend to Leitch's Wharf;  Leitch's Wharf is specifically named in the local code;  the Attorney General's office indicated it would not participate in the action;  appellants' property is still subject to trespass;  and without a ruling on the constitutionality of the code, law enforcement cannot effectively respond to the public's unlawful use of appellants' property and the State's Attorney's office cannot prosecute offenders for criminal trespass."

Initially, the Court of Special Appeals, in an unreported opinion, found the language of the easement at issue to be ambiguous:

"Appellants' next contention contains two parts.  First, appellants claim that the trial court erred in finding that the 1949 Deed was ambiguous.  Second, they complain that the court erred in ruling that the easement 'extends to the present day barricade. . . .', because there was 'no competent evidence' that showed that the easement extends past

the turn around [sic]. . . . We shall resolve the first point, but we are unable to resolve the second."

In concluding that the easement was indeed ambiguous, the intermediate appellate court further found that the testimony at the trial, by the nature in which it was given and the failure of trial counsel to clarify the issues by connecting the testimony to the exhibits in the record, did not contain a sufficient description of the easement, as presented in that record, to resolve the language it considered ambiguous. Accordingly, the intermediate appellate court found it necessary to remand the case for further proceedings. Furthermore, because of its determination regarding the easement, the court did not resolve any of the other issues. Rather, the court chose to "neither affirm nor reverse the [trial] court's determination as to the location of the easement" and stated that, "[i]nstead, we shall remand for further proceedings. . . . Given our resolution of the case, we also decline to reach the constitutionality claim in Count III, which the [trial] court below did not address based on a finding of mootness."

After the remand hearing, appellants again appealed. On our own motion we issued a writ of certiorari on December 11, 2006, to the Court of Special Appeals prior to any further proceedings in that court. *Weems v. Calvert County,* 396 Md. 11, 912 A.2d 647 (2006).

In this appeal appellants present two questions:

"I. Whether the trial court erred in arbitrarily disregarding appellants' expert's opinion and thereafter finding that the westerly terminal of the easement granted in the 1949 Deed, was located within Appellant Weems' property[?]

II. Whether the trial court erred when it did not find § 15–201 of the Calvert County Code unconstitutional as applied to appellants' property at Leitch's Wharf[?]"

In reaching our determination, it is necessary to review the two key documents that are in dispute: (1) the easement at issue and (2) § 15–201 of the Calvert County Code.

The language of the easement that creates the present controversy is found in a Deed granting easements from

numerous parties to the "County Commissioners" of Calvert County. The controversial language provides:

"2. The remaining of the above mentioned parties of the first part do hereby grant a parcel or strip of ground beginning for the same at the intersection of the present County road, and the land of Thomas I. Weems and Clifton Smith, and running in a westerly direction adjacent to and through the lands of the above mentioned parties of the first part, and running with the center of the said present county road, said 30 foot strip lying 15 feet on each side of the center line thereof, and *having for its westerly terminal the lands of the grantor, Lydia Leitch."* [Emphasis added.] Section 15–201 of the Calvert County Code provides in relevant part:

"**Subtitle 2**

**Access to Wharves and Landings**

§ 15–201. Established. [Code 1981, § 15–101, 1985, ch. 715, § 2]

(a) The public shall have an easement or right-of-way over any roads or ways in Calvert County leading to ... Leitch's Wharf....

(b) The purpose of this easement or right-of-way is solely for access to the wharves and landings and enjoyment of the wharves and landings by the public."

## A.   The Language of the Easement

■ The only language of the easement that is in controversy in this case is the last phrase: *"having for its westerly terminal the lands of the grantor, Lydia Leitch."* That language simply is not ambiguous. While there may be some confusion as to who was a "party of the first part" at any given place in the granting document, the easement being granted had its westerly boundary clearly fixed. Therefore, as relevant to the present controversy, it makes no difference who was who. The easement ends at the easement's westerly terminus, i.e., where it first touches the property then owned

by Lydia Leitch. All of the evidence is consistent that the turnabout as shown on the various photographs and plats marks the point where the right-of-way first touched Lydia Leitch's land. None of the parties seriously contests that point. Accordingly, that is where the easement ends.[1] The term *"westerly"* as used in the deed of easement does not refer to the westerly boundary of the Leitch property, it refers to the westerly boundary of the easement. The *"lands of Lydia Leitch"* was, in essence, a "call"—it defined the western end point of the easement, i.e., the western boundary, which is the easement's terminus.

A "call" is a term used in describing the boundaries of property. *Black's Law Dictionary* 217 (8th ed.2004), defines a "call" as "5. A landmark designating a property boundary." [2] In a case involving a dispute as to whether the underlying title of certain grantees carried to the middle of a public way, we explained the nature of "calls." We said in *Hunt v. Brown,* 75 Md. 481, 483, 23 A. 1029, 1030 (1892):

> "And, whatever may be the rule elsewhere, it is well settled in this State that a grant of land by metes and bounds and courses and distances, with *calls* for visible boundaries on the side of a highway; for instance a *call* for a stone planted in the south side of the road, and running thence, by the south side of the road to another stone, *these calls and boundaries will be construed as defining the limits of the property thereby conveyed; and the grantee under such a grant will not take the fee to the middle of the road."* (Emphasis added.) ·

*See Gump v. Sibley,* 79 Md. 165, 28 A. 977 (1894). We noted in *Crook v. Pitcher,* 61 Md. 510 (1884), that we were faced with a claim that the description of a private way was ambiguous. The relevant language of the instrument provided ". . . from

---

1. We are only concerned in this case with the rights granted to the County in the 1949 deed of easement.

2. "The landmarks are chosen by the surveyor and recorded in his field notes or in the accompanying deed." *Black's Law Dictionary* 217 (8th ed.2004).

said 'land, over a road adjoining the same, and running to the highway which leads from Chase's Station to the Philadelphia road....'" *Id.* at 514. We held that "[t]he *termini a quo* [from which] and *ad quem* [point of arrival] are distinctly stated, ... and is ... a sufficient description of the way obstructed." *Id.* at 514–15 (citations omitted).

██ In respect to the description of the easement in the case *sub judice,* it, as indicated, sets its terminus as "the lands of Lydia Leitch." Laying a course to the lands of a particular party is, as noted *supra,* a call. It sets the boundary of that property being granted by referencing the boundary of another property beyond which the lands being granted do not go— unless expressly provided otherwise. We talked about beginning and ending terminus calls in *Capron v. Greenway,* 74 Md. 289, 291–93, 22 A. 269, 269 (1891), albeit as dicta:

> "In the deed of February, 1872, from the trustees to the appellee, a private right of way, 66 feet in width was reserved, 'running north from the above mentioned county road [now Merryman's lane] and extending along the western line of said lot' conveyed to Greenway....
>
> The appellee erected a fence across this right of way, and the appellant filed a bill of complaint now before us, praying that Greenway might be required to open the right of way....
>
> By the express terms of the deed of 1872, the way extended north from Merryman's lane along the western line ..., and no further.... Its northern extremity was coincident with the northern terminus of Greenway's western line in the deed of 1872, and that point was 525 feet north of Merryman's lane." (Brackets in original.)

*See also Kelly v. Nagle,* 150 Md. 125, 132 A. 587 (1926); *Rowe v. Nally,* 81 Md. 367, 368, 32 A. 198, 198 (1895) ("It was also averred ... he was entitled to have a gate maintained at the public road at the terminus of the strip.").

In the case *sub judice,* it is clear that the western boundary of the easement ends at the Leitch property, not within the property, and not at the westerly boundary of the property,

but at the very point where the easement first touches the then property of Lydia Leitch (extant from the record as marked on the various photographs and maps as the turn-around). This clearly and unambiguously demarcates the westerly point of the right-of-way as described in the deed. There is no dispute as to the other boundaries of the easement relevant to the instant case. This case only concerns the western boundary of the public easement. The County has no rights, under this easement, beyond that point. On that issue, there is no ambiguity in regard to the easement. When the Court of Special Appeals first addressed the issue, that court should not have remanded the case. It should have found the contested description in the easement to be unambiguous as we do today.

In deeds granting easements, ambiguity only exists when the particular location point at issue cannot be determined, not in instances where the location point is clear from the language of the deed. If there was any ambiguity in respect to language (of which there is none in this case with respect to the boundary at issue) then, in such an event, other evidence might be considered to attempt to locate the right of way. The case *sub judice,* however, is distinguishable from cases in which the Court has found it necessary to look outside the four corners of a granting document.

The case of *Sibbel v. Fitch,* 182 Md. 323, 325–27, 34 A.2d 773, 773–74 (1943), involved language granting an easement from one place to another but not fixing the intervening location. Grantors conveyed a 91 + acre tract of property that lay between the Grantors' family cemetery and a public road, but included language in the conveyance that read: " 'saving thereout the family graveyard and reserving also a right of way to and from the graveyard.' " *Id.* at 325, 34 A.2d at 773. There was no other attempt to fix the location of the right-of-way. From the time of the original conveyance in 1866 until at least 1918 (during which period there were conveyances of portions of the 91 + acre tract) "the right of way to the family graveyard ran in an easterly direction between the house and

barn that were on the farm in 1866, and after passing the barn turned north and ran to the graveyard." *Id.* It was called the "Old Road." *Id.*

During the period of 1917 through 1926 a new road was built by one of the successors to the original grantee of the 91+ acre tract. The original "old road" was still intermittently used. Between 1926 and 1939 there were seven funerals, "all of which went over the new road." *Id.* at 326, 34 A.2d at 773. In 1939, the owners of the servient tract erected a barrier to keep persons from using the new road to reach the graveyard. We described the initial issue as: "The principal question for decision is whether the appellees have acquired any vested right in the new road." *Id.* at 326, 34 A.2d at 774. The Court opined:

"The deed of 1866 reserved a right of way in general terms, without defining its location my metes and bounds. For more than half a century the old road was used as the right of way reserved, and this raises an inference that the owners of the dominant and servient tenements had agreed upon the metes and bounds of the right of way reserved, and its location thereby became as definite and fixed as if it had been described in the deed of 1866 by metes and bounds. There is every indication that the old road was in existence prior to 1866, and was the existing right of way to the family graveyard at the time the deed of 1866 was executed.

" 'Where a way is granted without fixing its location, but there is a way already located at the time of the grant, such way will be held to be the location of the way granted unless a contrary intention appears.' 28 *C.J.S., Easements,* Sec. 80, Subsec. b.

"This principle of law is well settled, and after the location of the right of way *which has been granted in general terms* has been defined and fixed by the owners of the dominant and servient tenements by user in a particular location over a long period of time, it becomes as definitely established as if the grant or reservation had so located it by metes and bounds and the location of the right of way as thus defined

can only be changed by agreement of the owners of the dominant and servient tenements.

" 'Where an easement in land, such as a way, is granted in general terms, without giving definite location and description of it, the location may be subsequently fixed by an express agreement of the parties, or by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor, provided the way is located within the boundaries of the land over which the right is granted. As otherwise expressed, it is a familiar rule, that, when a right of way is granted *without defined limits,* the practical location and use of such a way by the grantee under his deed acquiesced in for a long time by the grantor will operate to fix the location. The location thus determined will have the same legal effect as though it had been fully described by the terms of the grant.' 28 *C.J.S., Easements,* Sec. 82."

*Sibbel,* 182 Md. at 326–27, 34 A.2d at 774 (emphasis added).[3] *See also Amabile v. Winkles,* 276 Md. 234, 241, 347 A.2d 212, 216 (1975) ("It must first be noted that an imprecisely described easement may be precisely located by user."); *Taylor v. Solter,* 247 Md. 446, 231 A.2d 697 (1967); *Burroughs v. Milligan,* 199 Md. 78, 84, 85 A.2d 775, 778 (1952) (Where a right of way "over [an] existing road" was involved and the Court noted: "What that existing road was at that time is a question of fact."); *Weeks v. Lewis,* 189 Md. 424, 56 A.2d 46 (1947); *Stevens v. Powell,* 152 Md. 604, 608, 137 A. 312, 313 (1927) ("The definition of its course by actual user during the period of its enjoyment by the dominant, and its recognition by the servient owners, is a sufficient identification of the way . . . .").[4]

---

3. In *Sibbel,* the dispute was not about the terminus of the easement, but, how to get there. The terminus was clear—the cemetery. The terminus is equally clear in the case at bar—the turnaround, i.e., ". . . the lands of . . . Lydia Leitch"

4. As far as the County's rights under this easement are concerned, the County's maintenance, if any, of any area inside the lands of Lydia

In the case *sub judice,* the westerly terminus of the right of way was not couched in general terms, as were the boundaries in the cases above discussed, but, rather it was specifically and purposefully described as *"having for its [the easement's] westerly terminal the lands of the grantor, Lydia Leitch."* That description of the westerly terminus has specifically defined and fixed limits, consistent with the Court's holding in *Sibbel.*

We hold that the relevant language in the deed of easement was not ambiguous. It clearly stated that the right-of-way terminated at the property line of Lydia Leitch—which is presently marked by the turnaround on the exhibits in the record. We hold that the turnaround point marks the end of the public right to the road insofar as the rights granted under the easement are concerned. In light of our decision in this case that the disputed language in the deed of easement is not ambiguous, we need not further answer appellants' question as to whether it was reversible error for the trial court to ignore or reject the testimony of Ms. Addis. We shall now address the second question presented by appellant.

## B. The Constitutionality of § 15–201 of the Calvert County Code as Applied to Appellants' Property

With our decision today, all of the property then owned by the late Lydia Leitch from the point of the turnaround, if not otherwise conveyed to governmental entities since the deed of easement of 1949, remains private property, and is entitled to all the protections afforded by the Federal and State Constitutions.[5]

---

Leach, the testimony of roads employees, and the like, are simply not relevant. The roadway beyond the turnaround was never part of the County road under the provisions of the easement at issue. It stopped at the turnaround.

**5.** The specific complaints of appellants as to the trespass of other persons, of which they complained to the County and the Sheriff, primarily related to the area beyond the "barricade." The County appeared to concede that the area was not within the bounds of what it claimed to be its public road.

■ One of the most important cases involving a governmental "taking" of the "right to exclude" segment of the "bundle of rights" that comprise private property rights, is *Nollan v. California Coastal Commission*, 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677 (1987). *Nollan* is in many ways fundamentally similar to the case *sub judice.* The primary difference is the procedure used in *Nollan* versus the procedure used in the case at bar. In both instances, private property owners were required by public agencies to give up their rights to exclude others from their private property without receiving compensation for the taking of their property rights.

When the Nollans sought to build a beachfront cottage, they were confronted with the provisions of a California statute that required them to obtain a permit from the California Coastal Commission. The Commission would only issue a permit if the Nollans would grant a public access easement across their property. The California Supreme Court upheld the regulatory action. The United States Supreme Court reversed, saying, in relevant part:

"Had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking. To say that appropriation of a public easement across a landowner's premises does not constitute a taking of a property interest but rather ... 'a mere restriction on its use,' ... is to use words in a manner that deprives them of all their ordinary meaning. ... We have repeatedly held that, as to property reserved by its owner for private use, 'the right to exclude [others is] one of the most essential sticks in the bundle of rights that are

---

With our decision today, unless the area of the road beyond the "turnaround" has been acquired by the County since the time of the 1949 deed, all of that area beyond the turnaround is private as well. The public has no rights to such private property.

commonly characterized as property.' " In *Loretto*[6] we observed that where governmental action results in "[a] permanent physical occupation' of the property, by the government itself or by others, . . . 'our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner. . . .' *We think a 'permanent physical occupation' has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises."*

*Nollan,* 483 U.S. at 831–32, 107 S.Ct. at 3145–46 (brackets in original) (citations omitted) (emphasis added) (footnote omitted). In reversing the California Supreme Court's decision, the Court concluded that:

"The Commission may well be right that it is a good idea, but that does not establish that the Nollans (and other coastal residents) alone can be compelled to contribute to its realization. Rather, California is free to advance its 'comprehensive program,' if it wishes, by using its power of eminent domain for this 'public purpose,' see U.S. Const., Amdt. 5; but if it wants an easement across the Nollans' property, it must pay for it."

*Nollan,* 483 U.S. at 841–42, 107 S.Ct. at 3151.

The Supreme Court has remained consistent in asserting that included amongst a property owner's "bundle of rights" is the right to exclude others. *See United States v. Craft,* 535 U.S. 274, 283, 122 S.Ct. 1414, 1423, 152 L.Ed.2d 437 (2002); *Dolan v. City of Tigard,* 512 U.S. 374, 384, 114 S.Ct. 2309, 2316, 129 L.Ed.2d 304 (1994) ("[T]he right to exclude others" is " 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' " (quoting *Kai-*

---

**6.** *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

*ser Aetna v. United States,* 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979))); *see also College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 673, 119 S.Ct. 2219, 2224, 144 L.Ed.2d 605 (1999) ("The hallmark of a protected property interest is the right to exclude others.").

In *Kaiser Aetna,* the Supreme Court discussed the "right to exclude" issue in relation to the Federal Government's attempted imposition of a "navigational servitude." 444 U.S. 164, 100 S.Ct. 383. Justice Rehnquist, writing for the Court, presented the issue as follows:

> "The Hawaii Kai Marina was developed by the dredging and filling of Kuapa Pond, which was a shallow lagoon separated from Maunalua Bay and the Pacific Ocean by a barrier beach. Although under Hawaii law Kuapa Pond was private property, the Court of Appeals for the Ninth Circuit held that when petitioners converted the pond into a marina and thereby connected it to the bay, it became subject to the 'navigational servitude' of the Federal Government. Thus, the public acquired a right of access to what was once petitioners' private pond."

*Id.* at 165, 100 S.Ct. at 385. The Court addressed the relevant aspect of property rights in its review of the Government's argument:

> "The Government contends that as a result of one of these improvements, the pond's connection to the navigable water in a manner approved by the Corps of Engineers, the owner has somehow lost one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others."

*Id.* at 176, 100 S.Ct. at 391. In conclusion, the Court stated:

> "In this case, we hold that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation. This is not a case in which the Government is exercising its regulatory power in a manner that will cause an insubstantial devaluation of

petitioners' private property; rather, the imposition of the navigational servitude in this context will result in an actual physical invasion of the privately owned marina. . . . Thus, if the Government wishes to make what was formerly Kuapa Pond into a public aquatic park . . . it may not, without invoking its eminent domain power and paying just compensation, require them to allow free access. . . ."

*Id.* at 179–08, 100 S.Ct. at 393 (emphasis added) (footnote omitted).

Finally, and perhaps most interesting, is a very recent Fourth Circuit case with facts very similar to those in the case *sub judice. Presley v. City of Charlottesville,* 464 F.3d 480 (4th Cir.2006) (a 42 U.S.C. § 1983 (2000) case decided on other grounds). Judge Motz, writing for the court, described the facts of that case:

"She [Presley] alleges that, without her consent, the Defendants conspired to publish a map that showed a public trail crossing her yard. Presley further alleges that, even after the Defendants realized their error, they did not correct it but rather criminally prosecuted her when she herself took measures to prevent trespasses on her property. . . .

. . .

"Presley's home and yard encompass less than an acre of land along the Rivanna River. In 1998, without having obtained her consent, the RTF [Rivanna Trails Foundation, a defendant] began distributing a map that displayed a public trail—known as the Rivanna trail—crossing a portion of Presley's property. The City publicized the RTF's map on the City's official website. Relying on the Rivanna trail map, members of the public began traveling across Presley's yard, leaving behind trash, damaging the vegetation, and sometimes even setting up overnight camp sites. . . .

"Although the Defendants acknowledged their error, they assertedly neither changed the map nor stopped its distribution. Rather, several RTF officials and members of the Charlottesville city council met with Presley and asked her

to give the Defendants an easement across her property in exchange for favorable tax treatment and other official favors (but not compensation). Presley refused.

"The intrusions by trespassers persisted and became more severe. Presley called the City police several times to eject the trespassers, but, although the police responded regularly, they could not stem the tide. Presley then posted over one hundred 'no trespassing' signs on her property, all of which were defaced and destroyed. Finally, Presley installed razor wire along the perimeter of her property. City officials responded by revising a local ordinance to prohibit Presley's protective measures and then bringing a criminal prosecution against her for violating that ordinance. The prosecution was later dismissed."

*Id.* at 482–83.

The Fourth Circuit discussed the seizure of Presley's property, finding that: "In fact, the Supreme Court has held that a seizure of property occurs whenever 'there is some meaningful interference with an individual's possessory interests in that property.'" *Presley,* 464 F.3d at 487 (quoting *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). The Court found that the constant physical occupation by people using the path "certainly constitutes a 'meaningful interference' with Presley's 'possessory interests' in her property." *Id.* Distinguishing between the actions of private individuals and government action, the Court opined:

"Of course, it is private individuals, not City officials, who have actually interfered with Presley's possessory interests here. Although private actions generally do not implicate the Fourth Amendment, when a private person acts 'as an agent of the Government or with the participation or knowledge of any governmental official,' then the private person's acts are attributed to the government. *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (internal quotation marks omitted). The government need not compel nor even involve itself directly in the private person's actions. For example, in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614–15, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989),

the Supreme Court held that 'breath and urine tests required by private railroads' implicated the Fourth Amendment when the railroads voluntarily complied with federal regulation governing such tests.

"As in *Skinner*, several factors in this case 'combine to convince us that [the Defendants] did more than adopt a passive attitude toward the underlying private conduct' and that therefore the acts of private persons are attributable to the Defendants. *See id.* at 615, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639. At some point the Defendants knew that their map was erroneous. They also knew that the Rivanna trail map would encourage public use of the trail-this was, after all, the map's purpose. Finally, Defendants also knew that the City's involvement would communicate to trail users that there were no legal barriers to their use of the entire trail, including the portion that cut through Presley's property. *Cf. Rossignol v. Voorhaar*, 316 F.3d 516, 525–26 (4th Cir.2003) (seizure attributable to the government when official 'gave "significant encouragement" to its [allegedly private] perpetrators').

"Nevertheless, despite this knowledge, the Defendants assertedly did nothing to correct their error, and consequently, in reliance upon the erroneous map, private individuals trespassed onto Presley's yard."

*Presley*, 464 F.3d at 487–88 (brackets in original) (footnotes omitted).

In the case *sub judice*, § 15–201 of the Calvert County Code provides in pertinent part:

"The public shall have an easement or right-of-way over any roads or ways in Calvert County leading to ... Leitch's Wharf.... The purpose of this easement or right-of-way is solely for access to the wharves and landings and enjoyment of the wharves and landings by the public."

It is constitutionally impermissible for the government to give the public the right to use the private property of a landowner without that landowner's permission, just as it would be unconstitutional for a governmental entity to enact a statute to give the public the right to go into and reside in the private

home of a citizen in Potomac, or Annapolis, or Ocean City. A governmental entity cannot grant some sort of license to the public to go into a homeowner's bedroom or his or her backyard. The legal and constitutional principles are exactly the same whether applied to a bedroom or a field.

The property described as Leitch's Wharf is clearly private property (even prior to this case, the County did not contend that the area beyond the barricade was public property), yet § 15–201 gives to the public a right-of-way and use easement to appellants' private property. That § 15–201 encourages members of the public to use appellants' property is clearly established. As a result of this statutorily mandated right-of-way, the Sheriff's Department has declined (or at least has been reluctant) to force trespassers off of the property.[7] The injury created by § 15–201 is clearly shown by the evidence in the record of this case. Section 15–201 seriously impedes the rights of appellants to exclude others from their private property. As applied to the lands of Lydia Leitch as they existed in 1949; it is unconstitutional in that it improperly and seriously interferes with appellants' rights to exclude others from their property without compensating them for the taking of that right to exclude "stick" from their bundle of property rights.

Unless there have been conveyances to the County since 1949 of parts of the property that were "lands of Lydia Leitch" at the time of the 1949 easement, all of the lands of Lydia Leach, as of 1949, westerly of the "turnaround," as indicated on the exhibits, are private property. No public right-of-way exists westerly of the turnaround; the public has no right of access past that point to any of the lands of Lydia Leitch, including any lands of hers, or her assigns, considered to be part of "Leitch's Wharf." [8]

---

**7.** The record indicates that when the Sheriff's Department has responded to appellants' complaints concerning trespassers, the alleged trespassers have presented copies of § 15–201 in assertion of their "right" to be on appellants' property.

**8.** What comprises the area of "Leitch's Wharf" is unclear. The exhibits in the record indicate that the wharf no longer exists and, when it was

**JUDGMENT OF THE CIRCUIT COURT FOR CAL-VERT COUNTY REVERSED; CASE REMANDED TO THAT COURT TO ENTER A DECLARATORY JUDG-MENT CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEES.**

---

in existence it was situated at a different place on the "lands of Lydia Leitch," far removed from the area of the "barricade" where much of the controversy had been centered. It may refer to the whole general area. It is unclear. But, in any event, there are no public access rights beyond the "turnaround."