TAYLOR, ET UX. *v.* SOLTER, ET UX.

[No. 470, September Term, 1966.]

*Decided July 13, 1967.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*J. Francis Ford,* with whom was *C. Rider Brandau,* on the brief, for appellants.

*B. Conway Taylor, Jr.,* for the appellees.

McWILLIAMS, J., delivered the opinion of the Court.

This imbroglio has to do with a country road. Judge Turnbull held the appellees (the Solters) have a right to use it. Appellant [1] (Mrs. Taylor) disagrees. Before the contentions of the parties can be brought into focus it is necessary to know something of the history of the land through which the road meanders.

In January 1933 Granville Arrowood became the owner of 97.24 acres of land in Baltimore County lying just south of the Mason-Dixon line. In October of the same year he conveyed lot A (see plat made a part of this opinion) to Fisher. The

---

1. Randolph D. Taylor died 12 April 1967.

western boundary of lot A is described in the deed as binding on the east side of "a private road owned and used by" Arrowood. Fisher was also granted an "easement and right * * * to the use of said * * * [16 foot] private road * * * as now used by said [Arrowood]" as a means of ingress and egress to Fisher's property "located on both sides of said road." (At the time Fisher owned lot F which is not a part of the 97 acres.)

In August 1935 Arrowood conveyed lot B to Ray whose deed provides that he has a right to the use of a "private road [2] 16' wide belonging to and owned by * * * [Arrowood and] as now used by [him] located through the western part of the property described herein as a means of ingress and egress to the property of the *grantees* located and adjoining the within described property on the south side." Obviously *grantees* was intended to be "grantors."

In October 1938 Arrowood conveyed lot D to Lowe. The deed grants the right to use "especially the 16 foot right of way now laid out on the west side of the remaining property [lot C] of * * * [Arrowood]."

In November 1938 Arrowood conveyed lot C to Mathews. The deed provides that "a driveway 16 feet wide is hereby reserved for the benefit of the tract [lot D] recently sold to" Lowe.

Fisher is still the owner of lot A. The other lots have changed hands several times. The Taylors became the owners of lot B in December 1954. The Solters acquired lots C and D in November 1965. Shortly thereafter the Taylors installed a heavy chain across the road and secured it in place by a padlock. The Solters have no other access to their property from the public roads. Their bill for an injunction and a declaratory decree was filed 6 December 1965.

2. "Road" used alone means the road from the stone house to the public road as indicated by the dotted line on the plat.

"Walchuck Road" means a road that once ran from near the Walchuck house to the stone house, now said to be both closed and impassable.

"Western Road" means a road said by appellant to have run, at some time in the past, somewhere along the western boundary of lots B and C.

Appellant concedes that the Solters have a right of way over lot B to the public roads. She contends, however, that their right of way is over a road that, at some unknown time in the past, was cut through the woods somewhere along the western boundary of her property (the Western Road). Except for the testimony of Jerome Hromadnik there is no evidence that such a road was ever used or that such a road ever existed. Mr. Hromadnik specializes in the examination of titles to real estate. He said he could locate the 16 foot easement on lot A, as, indeed, could anyone, but that he could not locate it on lots B, C or D. He testified that he visited the area and that he found some evidence (a few stones according to the photographs) of an old stone wall about 870 feet west of the road in front of the Taylor cabin. He did not say what the extent of the wall was or might have been but he said he saw near the "wall" an opening in the trees that looked "like an old roadway to" him. He identified a photograph of what he said was the "old roadway." We have studied the photograph and we feel bound to say that such a conclusion requires a livelier imagination than has been bestowed on any of us. Even if we assume that there may have been at one time a logging road at this point there is no evidence to indicate where it went, who used it, or that it would have been of any use to the residents of the stone house on lot D. In any event there is testimony to the contrary.

In 1921, when Gerry McCullough was 3 years old, his family moved to a farm which included the 97.24 acres later acquired by Arrowood. He lived in what is now the Walchuck house until 1945. Although he moved away, his family continued to reside there until 1955 or 1956. He visited them about twice a week. He said the occupants of the stone house were served by two roads. One came in by the Walchuck house and the other came down from the north (the road). Both roads were used continuously. He identified all of the color photographs of the road and he said he saw no change in its nature or location and that it was as he recalled it during the years he lived there.

The Solters claim that the Walchuck road, east of the Walchuck house, was never used for vehicular traffic and is not now suitable, except at considerable expense, for vehicular traffic. Walchuck has declared the Solters have no right to cross

his property and he has effectively prevented access to their property across his land. In any event, the Walchuck road has no significance in the case at bar.

Harrison B. Dayton, the son-in-law of Granville Arrowood, lived in the stone house from 1933 to 1937. He visited the property a few weeks before the trial. He said when he lived on the property ingress and egress were accomplished both by the road and the Walchuck road. He described the road as being the same as it was during the time he lived there.

Essie Kopp, Dayton's daughter, said she was 5 years old when her father moved to the stone house. When she visited the property a few weeks before trial she found the location and condition of the road to be the same as she remembered it to be.

Harry Nace has worked for oil companies in the area since 1951 or 1952. Beginning about 15 years before the trial, he delivered oil to the occupants of the stone house every two weeks in cold weather and once a month when it was not so cold. He would drive his truck over the road and put the oil in 50 gallon drums provided by the occupant. He presented records showing regular deliveries over a period of 10 years. The road, he said, was the same during the entire period of his use of it.

Frances Phillips is the daughter of Mr. and Mrs. Sibley who owned lot B from 1944 to 1951. She visited her parents from time to time on weekends and in the summer time. She testified her father placed a chain across the road at the north entrance to lot B and that he erected a gate at the southern boundary. They were kept in place, as far as she knew, while her father owned the property. There was nothing to indicate that either the chain or the gate was ever locked. She said the road "was in fairly good condition" south of her father's property. She made some reference to another road along the easterly edge of the property but that testimony, even if true, seems to us to lack relevance to the question before us.

The Taylors allowed Herbert Wirtz to hunt on their property. He said he hunted there every season since they bought it. He expressed the opinion that the road south of lot B was

impassable to vehicles until the "cannery people" [3] went in there to farm lot D. The balance of his testimony lacks relevance.

Mrs. Taylor testified she didn't "believe an automobile, in 1954, could have gotten through" over the road from her line to lots C and D. She said they "permitted" the Lees (the Solters' predecessors in title) to use the road through their property because Mrs. Lee was ill. There were gates at the north and south lines of the property when they bought it but she "actually never saw the gates across the road." She said nothing about a road along the western boundary of lots B and C.

There appears to be no dispute about the fact that the road, as it exists today, was in existence and in use when Arrowood bought the 97 acre tract in 1933. Any lingering doubt as to that is banished by the testimony of McCullough, Dayton and Essie Kopp. When Arrowood conveyed lot A to Fisher he was careful to retain title to the westernmost 16 foot strip which the deed describes as being *owned and used* by him, and, entirely consistent with his ownership, he gave Fisher a right to use the 16 foot strip so that Fisher would have access not only to lot A but to lot F as well.

Two years later, in the deed which conveyed lot B to Ray (a predecessor in title of Mrs. Taylor), language was used which was both clumsy and imprecise. However, we think the intent of the grantor is clear. He gave Ray a right to use the 16 foot road running through lot A to the public road. Ray probably would have acquired that right anyway under the clause "together with the rights, ways, waters * * * thereto belonging or appertaining." In the circumstances, the only reasonable construction of the remainder of the language is that Arrowood was reserving a right of way over the road running through lot B for the benefit of his home and his remaining property, lots C and D, the use of which he continued as before. Appellant makes much of the expression "located through the western part" of lot B, claiming it refers to the "Western Road" and not to the road. We see no merit in this. As a matter of fact,

---

**3.** There was testimony that both the Taylors and the predecessors in title of the Solters leased cleared portions of their land to a farming company.

the road does run close to the western boundary of lot B for more than half its length.

In 1938 Arrowood sold lot D to Lowe. In addition to the usual grant of "rights, alleys, ways, [and] waters" we find the expression "especially the 16 foot right of way now laid out on the west side of the remaining property of" Arrowood. The "remaining property" is, of course, lot C and it is quite clear that the road is not on its "west side" but on its east side. We think this is an obvious inadvertence on the part of the draftsman. The grant concerns a 16 foot right of way "now laid out" and there is no evidence that a right of way of any width was ever "laid out" anywhere on lot C except, of course, the road. When lot C was sold, a month later, to Mathews the deed provided that "a driveway 16 feet wide" was reserved for the benefit of lot D "recently sold to" Lowe.

It is important to remember that the appellant concedes the Solters have a right of way across her property. She insists, however, that its location is somewhere in the western part of her property. We do not think the evidence supports her claim. Judge Turnbull found as a fact

> "that the road through the Woods [lot C] and through the Taylor [lot B] tract[s] as described by the witnesses, as shown by the photographs has been used for many, many, many years, and has been used for many years prior to the first severing of the entire tract; * * * [and] that the reference * * * to the sixteen foot road as now being used * * * was meant and understood to be * * * the road described in the evidence and as shown by the pictures."

Judge Turnbull found it unnecessary, as do we, to consider the doctrines of adverse user and way of necessity, both of which were raised by appellees in this Court as well as in the trial court. In our judgment the case at bar falls comfortably within the familiar rule stated in *Sibbel v. Fitch*, 182 Md. 323, 326-27, 34 A. 2d 773 (1943):

> " 'Where a way is granted without fixing its location, but there is a way already located at the time of the grant, such way will be held to be the location of

the way granted unless a contrary intention appears.'
28 C.J.S., *Easements,* Sec. 80, Subsec. b."

\* \* \*

" 'Where an easement in land, such as a way, is
granted in general terms, without giving definite loca-
tion and description of it, the location may be subse-
quently fixed by an express agreement of the parties,
or by an implied agreement arising out of the use of
a particular way by the grantee and acquiescence on
the part of the grantor, provided the way is located
within the boundaries of the land over which the right
is granted. As otherwise expressed, it is a familiar rule,
that, when a right of way is granted without defined
limits, the practical location and use of such way by
the grantee under his deed acquiesced in for a long
time by the grantor will operate to fix the location.
The location thus determined will have the same legal
effect as though it had been fully described by the
terms of the grant.' 28 C.J.S., *Easements,* Sec. 82."

To the same effect see *Weeks v. Lewis,* 189 Md. 424, 427, 56
A. 2d 46 (1947).

In light of what we have said in this opinion we see no rea-
son for disturbing the decree passed by Judge Turnbull.

*Decree affirmed.*
*Appellant to pay the costs.*

454

← Public Road

PA.
MD.

F

A  11·86 A

B

CHAIN

CABIN

25.46A

20A  C

STONE
HOUSE.

WALCHUCK

D
39·92 A

← Public Road

1" = 600'

Total Acreage = 97.24