967 A.2d 807

**Joseph Sheppard ROGERS, Trustee**

v.

**P–M HUNTER'S RIDGE, LLC, et al.**

**No. 76 Sept.Term, 2008.**

Court of Appeals of Maryland.

March 18, 2009.

Price O. Gielen (Ryan R. Dietrich of Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore), on brief, for petitioner.

Gina M. Smith (Joseph B. Chazen and Chantelle M. Custodio of Meyers, Rodbell & Rosenbaum, P.A., Riverdale), on brief, for respondents.

ARGUED BEFORE BELL, C.J., BATTAGLIA, GREENE, MURPHY, BARBERA, LAWRENCE F. RODOWSKY (Retired, specially assigned), and RAYMOND G. THIEME, JR. (Retired, specially assigned), JJ.

BATTAGLIA, Judge.

The gravamen of this case is whether a servient tenant, who acquiesces in the placement of a roadway easement established in deeds in which two placement options were provided, can extinguish that easement in favor of the second option, without the consent of the dominant tenant.[1] Associated with

---

[1] A dominant tenant is the owner of "[a]n estate that benefits from an easement"; a servient tenant is the owner of "[a]n estate burdened by

this question are issues related to the placement of utility easements. The Circuit Court judge ruled in favor of the servient tenant, and the Court of Special Appeals affirmed. We granted certiorari, *Rogers v. Hunter's Ridge*, 405 Md. 506, 954 A.2d 467 (2008), and are called upon to address two questions:

 1. Did the Court of Special Appeals err in finding that a constructed roadway expressly designated as permanent may nonetheless be destroyed and relocated pursuant to the terms of a Deed?

 2. Did the Court of Special Appeals err in determining that Respondent may unilaterally and completely extinguish perpetual easements created by the parties for the express benefit of Petitioner?

## I. Facts

The property in question is a rectangular tract of land in Prince George's County, Maryland, adjoining the west side of Landover Road.[2] In November of 1944, the tract was acquired by Anna and James Rogers, who are the parents of Joseph Sheppard Rogers, the petitioner herein, and Trustee of the Rogers Estate. In 1963, portions of the Rogers property were conveyed in two separate deeds to Landover Gardens Apartments, L.P. (hereinafter "Landover Gardens"), and SDN Landover Corporation (hereinafter "SDN");[3] Landover Gardens obtained a 8.9–acre rectangular parcel in the east of the tract, abutting Landover Road, and SDN obtained 33.9 acres,

---

an easement." *See* Blacks Law Dictionary 589 (8th ed. 2004) (defining "dominant estate" and "servient estate").

**2.** Part of the tract called Beall's Pleasure is registered as a national historic site. It is named after the original grantee of the property, Col. Niniam Beall, a Scottish Highlander, who, after being sent into involuntary servitude in Barbados by Oliver Cromwell, went on to become Commander in Chief of the Provincial Forces of the Maryland Militia and a member of the Maryland House of Burgesses.

**3.** The trial judge noted from the record that "it was evident ... that many of the corporate officers of SDN were also general partners of [Landover Gardens, LP]."

bordering on the Landover Gardens tract in the east and 75th Avenue in the Southwest.[4] The Rogers retained a small six-acre square tract that was surrounded by SDN's parcel on three sides and an unrelated property to the north.[5]

## A. The 1963 Deeds

The Rogers conveyed parcels to Landover Gardens and SDN in two separate deeds, both of which reserved roadway easements to Landover Road and created easements for water, sewage and gas (collectively the "utility easements") in a memorandum attached to the deeds. The SDN Deed provided:[6]

[Metes and Bounds description of the land conveyed] RE-SERVING, HOWEVER, unto the [Rogers], their heirs and assigns, an easement over the existing road on the Westerly side of the property hereby conveyed, which, together with the easement reserved by the [Rogers] in a deed of even date to Landover Gardens Apartments, Limited Partnership, is to provide ingress and egress from Landover Road to the residue of the property of the [Rogers]. The aforesaid easement will be extinguished by the [Rogers], their heirs or assigns at any time after one (1) year if a means of access from said road to the retained property of at least equal quality is provided.

[SDN], its successors and assigns, agree that as development of the property herein takes place, *there shall be provided within such development a permanent roadway*

---

**4.** The trial judge found that 75th Avenue was dedicated as a public road in 1963. Landover Road is the only other road bordering the tract.

**5.** Technically, the rectangular property is oriented in the southeast to northwest direction, but the deeds and agreements refer to Landover Road as being to the east of the property, and for the sake of consistency and clarity, we shall retain the simplified orientations set forth in the deeds and agreements.

**6.** In the SDN Deed, the Rogers also reserved an express easement over an existing road on the west side of the property, referred to by the parties as the "Historic Road." That easement is not involved in the instant case.

*not less than 22 feet to be constructed and maintained by [SDN], its successors and assigns, to the property on the South side of the property herein described which will connect to the proposed roadway located within said property to provide a permanent means of access from said Landover Road to the property retained by the [Rogers] and to connect to said retained property on the Easterly side thereof or at such other point as may be mutually agreed to by the parties hereto or their respective heirs, successors and assigns; or in lieu of such private roadway, [SDN] may dedicate and construct a public roadway across the herein described property which will provide a means of access to Landover Road or to an existing public roadway leading to Landover Road* and it is further agreed that in the event [SDN] ha[s] failed to do so on or before the date said retained property is offered for sale to [SDN], its successors or assigns, or in any event on or before five (5) years from date hereof, then and in that event the parties of the first part shall have the right to construct a roadway not more than thirty (30) feet wide across the herein described land to connect to the then existing private roadways constructed by the [Rogers] it shall be constructed and maintained by said parties of the second part leading to Landover Road; any such roadway to be located approximately as shown on the site plan entitled "Landover Gardens, Section One, dated July 16, 1963" or at such other location as the parties hereto or their respective heirs, successors or assigns may agree and in the event any such roadway is constructed by the [Rogers] it shall be constructed and maintained by said parties for the exclusive use of [the Rogers], and their agents, guests, or assigns, unless and until such time as [SDN] agree[s] to maintain said roadway, at which time [SDN] shall have the right to use said roadway in common with the [Rogers]; *and [SDN], its successors and assigns, shall have the right, at its expense, to relocate any portion of said roadway,* any such relocated portion to be of comparable quality and construction.

(Emphasis added). In essence, the SDN Deed permitted two alternative right of way easements for the Rogers parcel for ingress/egress to Landover Road: (1) SDN could create a private road designed to connect the Rogers property with the property "to the east side," (the Landover Gardens property) and then onto Landover Road, or (2) "in lieu of such private roadway," SDN could construct a public roadway as a means of access to Landover Road or to "an existing public roadway leading to Landover Road."

The Landover Gardens' Deed also created roadway easements to Landover Road for the benefit of the Rogers parcel:

> [Landover Gardens], its successors and assigns, agree that as development of the property herein described takes place, there shall be provided, for the use of the [Rogers], their heirs and assigns, in common with others, a permanent roadway within said development to provide ingress and egress from Landover Road to the property on the North side of the property herein described [SDN's property]; said roadway to be located approximately as shown on the site plan entitled: "Landover Gardens, Section One, dated 7/16/63" and to be not less than 22 feet wide and to be maintained by [Landover Gardens], its successors and assigns, unless the same is dedicated to public use, and it is further agreed that in the event said permanent roadway has not been so constructed within two years from the date hereof then and in that event, the [Rogers], their heirs and assigns, shall have the right to construct a roadway not more that 30 feet wide across the herein described land to be located approximately as shown on the above described site plan or at other such location as the parties hereto, their heirs, successors or assigns, may agree; it being agreed that in the event the [Rogers] construct said roadway that in such event said roadway shall be constructed and maintained by said parties and shall be for the exclusive use of said parties and their agents, guests, invitees unless and until such time as the [Landover Gardens] agree[s] to maintain said roadway, at which time [Landover Gardens] shall have the right to use the roadway in common with the

[Rogers]; and [Landover Gardens], its successors and assigns, shall have the right, at its expense, to relocate any portion of said roadway, and such relocated portion to be of comparable quality and construction.

Landover Gardens, thus, provided the Rogers parcel, the dominant estate, with a right-of-way from the SDN property to Landover Road, over a specified location identified in a site plan; it is undisputed, however, that this site plan cannot be found in any records.

Attached to *both* the Landover Gardens and SDN Deeds were memoranda that created utility easements for the benefit of the Rogers parcel; the utility easements permitted the Rogers to connect into sewer, water or gas lines on the Landover Gardens/SDN properties at the Rogers' own expense, to be further specified by a subsequent instrument, should the need arise:

NOW, THEREFORE, it is understood between the parties hereto that the purchaser, Landover Gardens Apartments Limited Partnership [or SDN], shall provide for the benefit of the property retained by the seller, a right to cross the property described in the aforesaid deed, in one or if necessary fully to serve the said retained parcel, at two locations, to be designated by the purchaser, which will not interfere with the purchasers use of property, for the installation at sellers cost of sewer, water and gas extensions to serve the retained parcel. Such right of access shall be granted in the form of a right of way or other appropriate instrument and sellers agree to be responsible for the cost of maintenance of any installations therein and for restoration thereof in the event repairs are necessary.

### B. The 1964 Declarations

On August 4, 1964, the Rogers, Landover Gardens and SDN entered into an "Agreement" reciting that the parties "reserved certain easements, across the land conveyed to [Landover and SDN] ... for the purpose of providing ingress and egress to and from Landover Road," and that Landover and

SDN "also agreed to provide certain roadways, etc., all as more particularly set forth in [the] Deeds" (hereinafter the "Driveway Agreement"). The Agreement was filed among the land records for Prince George's County and provided, in pertinent part:

WHEREAS, the parties hereto desire to clarify their previous understanding regarding the means of ingress and egress to the roadway connecting to Landover Road.

\* \* \*

[Landover and SDN give the Rogers] the right to install two (2) twenty-two (22) foot wide driveways at a point or points to be selected by [the Rogers] along [the easterly border of the Rogers Property] to connect to the roadway to be constructed by [Landover and SDN] to provide ingress and egress to and from Landover Road....

\* \* \*

[Landover and SDN] agree to provide [the Rogers] with a temporary access to connect to the [existing road while the sewer facilities were being constructed] and do further agree to restore and maintain said existing road after said sewer facilities are installed so that it is passable by passenger vehicles at all times until such time as said roadways is replaced by a permanent means of ingress and egress to and from Landover Road and [the Rogers Property].

Approximately two weeks later, on August 20, 1964, SDN, the Rogers, and various trustees representing secured interests, entered into a "Declaration of Easement for the Purposes of Ingress and Egress and for Water and Sanitary Sewer" (hereinafter the "1964 Declaration"), which provided, in pertinent part:

NOW THEREFORE, [SDN] with the consent of the other parties hereto does establish and create a perpetual easement and right of way for ingress and egress for pedestrian and vehicular traffic over the following described property for the common use of the owners, lessees and occupants of all improvements constructed or to be constructed on the

aforesaid Parcel "A": [a metes and bounds description of the easement].

\* \* \*

[SDN] with the consent of the other parties hereto, does also hereby establish and create a perpetual easement and right of way for the installation and maintenance of water and sanitary sewer lines for the purposes aforesaid within the strips of property hereinafter described. [A metes and bounds description of the water line and sanitary sewer easements]

\* \* \*

This agreement is intended to create perpetual easements to run with the land and shall bind the parties hereto, their successors and assigns and inure to the benefit of all parties hereto as well as those claiming by, through, or under them.

It is undisputed that the metes and bounds descriptions in the 1964 Declaration established three easements for roads, which were connected to Landover Road, but none of which connected to the Rogers property. Part A of the metes and bounds descriptions created an easement for Mathias Road, which travels in a straight line west from Landover Road to a point near the southeastern corner of the Rogers property; the road passes the southern border of the Rogers property and was set to lie 200 feet away from the Rogers southern border. Part B created Loop Road traveling west from Landover Road and after crossing Landover Gardens property into SDN property, curving right and to the south to meet Mathias Road. Part C created a short "Stub Road," arising in the northwestern side of Loop Road and traveling west and parallel-to Mathias Road; it stopped well short of the Rogers tract's eastern border. The trial judge found that each of these roads was, in fact, established according to their metes and bounds description.[7]

---

**7.** Notably, Landover Gardens was not a party to the 1964 Declaration, even though the 1964 Declaration purports to grant easements over both the Landover Gardens and SDN tracts. Although the effect of this omission has been disputed by the parties, the trial judge concluded

## C. The 1968 Declaration

In 1968, SDN and various trustees representing interests of the Rogers executed and filed a "Declaration of Easements for Purposes of Ingress and Egress for Water and Sanitary Sewer" (hereinafter "1968 Declaration"), for "the common use of the owners, lessees and occupants of all improvements constructed or to be constructed on . . . Parcel 'A' ":

> WHEREAS, the aforesaid Parcel "A" has been subdivided into various parcels on which apartment projects have been built, and it is contemplated that said parcel may be further subdivided in the future for the construction of additional apartment projects and it is desired to hereby establish easements of rights of way for ingress and egress for owners, lessees and occupants of all of the improvements erected on said Parcel "A", which rights of way are to be used in common and for the benefit of all of the various owners, lessees and occupants of said land and the improvements thereon erected, their tenants, servants, visitors, licensees and successors in title; and

> WHEREAS, it is also considered essential to create easements for the benefit of the owners of the entire Parcel "A" as aforesesaid, their successors and assigns, for the installation and maintenance of necessary water and sanitary sewer mains to serve the apartments intended to be constructed on said property.

The 1968 Declaration established a roadway easement in two parts. Part I began at the end of the Mathias Road easement, established by the 1964 Declaration, and extended Mathias Road to a point near the southeastern corner of the Rogers' property:

---

that Landover LP should have been a party, and thus "would be estopped to claim that it was not a formal signatory," and the Court of Special Appeals agreed, explaining that, "Landover relinquished any right to claim that the agreement was invalid and unenforceable." Because this question has not been presented to this Court, we do not address this issue.

NOW, THEREFORE, [SDN], with the consent of [the trustees], does hereby establish and create a perpetual easement and right of way for ingress and egress for pedestrian and vehicular traffic over the following described property for the common use of the owners, lessees and occupants of all improvements constructed or to be constructed on the aforesaid Parcel "A":

Being an easement and right of way twenty (20) feet wide, for ingress and egress for pedestrian and vehicular traffic, through part of Parcel "A" per plat of subdivision entitled "Parcel "A", Landover Gardens" ... the centerline of said easement and right of way being more particularly described, as follows, in two parts:

Part I: Beginning ... at the end of ... Part A of the centerline of the twenty (20) foot wide ingress and egress easement and right of way previously established and created per [1964 Declaration] and agreement heretofore made by and between SDN Landover Corp., et al. ... and running thence for said centerline ...

(1) 85.16 feet along the arc of a curve deflecting to the right, having a radius of 665.19 feet and a chord bearing and length of North 33° 33′ 14″ East 85.10 feet, to a point of tangency; thence

(2) North 37° 13′ 18″ East 259.82 feet to the end of said centerline

Part II began at the end of this easement, and traveled 35 feet in a path perpendicular to Mathias Road near the Rogers property:

Part II: Beginning for the same 15.00 feet from the end of the second line of Part I, hereinabove, and running thence for said centerline (1) North 52° 46′ 42″ West 35.00 feet, to the end of said centerline on the southeast line of [the Rogers Property].

After Mathias, Loop and Stub Roads were constructed in accordance with their metes and bounds descriptions, a gap existed between the easements and the Rogers parcel, and in particular, between Mathias Road and the Rogers' driveway.

Anne Rogers sued SDN to enforce her roadway easement to Landover Road, and in 1969, SDN was ordered by a judge of the Circuit Court for Prince George's County to permit Rogers to construct a roadway across its parcel in order to connect the Rogers parcel with Mathias Road, which, in turn, provided access to Landover Road:

> The Court having found that defendant has not provided a permanent roadway not less than twenty-two (22) feet as set forth in the Deed of September 26, 1963 . . . and more than five years having elapsed from the date thereof, it is by the Court ordered that the plaintiff has the right to construct a roadway not more than thirty (30) feet wide across the land of the defendant to connect through the existing private roadways to Landover Road, which road shall be constructed from the existing 60–foot street at a distance of 388.77 feet, along the center line with a bearing North 37 degrees, 13 minutes, 18 seconds East. In addition thereto the plaintiff shall be permitted to construct two 22–foot driveways or one 44–foot driveway from the aforesaid 3 0–foot roadway to her property and shall be permitted to install the necessary drainage from her property under the said 30–foot roadway to adequately carry off the water from her property for its present use. The aforesaid right shall be subject to the defendant's future right to construct or continue the existing 60–foot roadway along and over the right-of-way described for this roadway and driveways, provided that when the defendant, their successors or assigns, shall make such improvements they shall tie the aforesaid driveways in to the said improved street.

Anne Rogers constructed a 388.77 foot road, connecting her driveway to Mathias Road and thereby with access to Landover Road. With respect to the utility easements, the Rogers have never connected into the utility systems constructed by SDN and Landover Gardens.

### D. Hunter's Ridge Purchase and Aftermath

Hunter's Ridge acquired both the Landover Gardens and SDN tracts in March of 2004, with the intention of replacing

existing apartment complexes on the tracts with newly constructed townhome condominiums, and filed an application for approval of a Detailed Site Plan for the project with the Development Review Division of the Maryland–National Capital Park and Planning Commission. That plan, and its successors, demonstrated that Hunter's Ridge proposed the destruction of all roads located on both parcels. Among other roads, Hunter's Ridge proposed building two new roadways, Beall's Pleasure Lane and Beall Court, to connect the Rogers property with 75th Avenue. The plan also included destruction of existing water and sewage lines and reconstruction elsewhere.

On November 7, 2005, Hunter's Ridge closed the private roads leading to Landover Road and provided the Rogers with a paved asphalt driveway to travel to 75th Avenue, which was to be used until the completion of Beall's Pleasure Lane and Beall Court.[8] The next day, the Rogers filed a motion for a temporary restraining order, asking for Mathias Road to be reopened. The judge denied the motion. Rogers filed an interlocutory appeal, which was voluntarily dismissed and a motion for injunctive relief pending appeal, which was denied.

## II. Procedural History

The present action was initiated when Hunter's Ridge filed a complaint in the Circuit Court for Prince George's County, seeking declaratory relief, permitting it to provide the Rogers parcel with access to Landover Road via 75th Avenue in lieu of Mathias, Loop and Stub Roads. The Rogers then filed a counterclaim for declaratory relief, regarding the location of ingress/egress and utility easements, for injunctive relief, concerning water drainage from the Hunter's Ridge onto their property,[9] and for the entry of an order quieting title. Rogers also filed an Amended Counterclaim, incorporating the original claims and adding Branch Banking and Trust Company

---

**8.** On July 28, 2006, Beall Court and Beall's Pleasure Lane were dedicated as public roadways. Beall's Pleasure Lane runs to the Rogers property. Beall's Court connects Beall's Pleasure Lane to 75th Avenue.

**9.** The water drainage issue is not before us.

and the Ryland Group, Inc., as Third Party Counter–Defendants. Hunters Ridge also amended its Complaint, to reassert its claim for declaratory relief, again, regarding the roadway and utility easements. On January 5, 2006, Rogers filed a Supplemental and Second Amended Counterclaim for Declaratory Relief to Retain and Enforce Express Permanent Easements, to Quiet Title to Real Property, and for Injunctive and Other Relief, adding counts of interference with an implied prescriptive easement as well as a nuisance action.

Hunter's Ridge then filed a motion for summary judgment, arguing that the language in the deeds permitted relocation of roadways of access. The Rogers also filed a motion for partial summary judgment, asserting that, as a matter of law, the original roadways could not be relocated. Both motions were denied.

Hunter's Ridge, thereafter, filed a Third Amended Complaint, adding another declaratory judgment count, which, for the first time, asserted that it could extinguish or destroy the established roadway easements by dedicating a public roadway that traversed a different location on its property under the terms of the 1963 Deeds. Rogers, in turn, filed a Third Amended Counterclaim and Third–Party Claim, stating that the Rogers parcel was the intended third-party beneficiary of declarations and agreements that created roadway and utility easements on the Hunter's Ridge parcel.

A bench trial, limited to determining whether the roadways, as well as sewer, gas and water lines could be relocated or extinguished, occurred in October of 2006. Hunter's Ridge contended that the original deed permitted the roadway easement to be constructed as a road leading to 75th Avenue, "in lieu of" a private roadway traversing its property. With respect to the utilities easements, Hunter's Ridge contended that they were not created, nor was their location set, for the benefit of the Rogers parcel.

Rogers argued that the plain meaning of the 1963 Deed did not permit Hunter's Ridge to move the roadway easement unilaterally and that any option to move the existing roadway

was no longer valid, because SDN elected to provide a private road years ago, and because subsequent agreements, locating easements of way, as well as water, sewage and gas lines, were for the benefit of and ran appurtenant to the Rogers land. After argument and testimony of two witnesses on behalf of Hunter's Ridge, called to offer legal conclusions regarding the interpretation of the original deeds, the trial judge ordered both parties to submit Proposed Findings of Fact and Conclusions of Law. In an oral opinion issued on February 5, 2007, followed by two memorandum opinions filed April 17, 2007, the trial judge held that Hunter's Ridge could construct a public roadway leading to 75th Avenue and that it could freely move or extinguish the utility easements, wholly located within the Hunter's Ridge tract.[10]

Rogers appealed to the Court of Special Appeals. Before that court Rogers argued that the words used to create and establish the easements clearly and unambiguously demonstrated that the parties intended that the easements not be "unilaterally extinguished, destroyed, relocated, or altered in any way." Rogers also contended that SDN and Landover exercised an option in response to the 1963 Deed that called for "permanent roadways," when SDN and Landover created easements and built roadways over their parcels. Hunter's Ridge countered that the option to establish a public road connecting to 75th Avenue remained viable since the 1963 Deed and that it could unilaterally relocate the easements.

The Court of Special Appeals affirmed in an unreported opinion. With respect to Hunter's Ridge's exercise of the public/private road option in the 1963 Deed, the panel regarded the Deed's language as unambiguous and applied a plain meaning analysis, holding that the servient tenant had the ability to exercise both options unilaterally, without any time restriction, in order to provide the Rogers parcel access either by a private road or by connecting the parcel to "an existing public roadway." The court interpreted the words of "perma-

---

**10.** The judge also ruled against Rogers regarding their prescriptive easement and adverse possession claims.

nent roadway" as meaning "lasting or enduring" but not "perpetual." The Court of Special Appeals also regarded the specific language in the 1963 Deeds as reserving a general easement and noted that the general reservation manifested an intent by the parties that the roadway would not remain in a permanent or fixed location:

> If the parties intended that the roadways described would be in one fixed location without alteration, the deeds would have described the roadways to be built as a perpetual easement defined by metes and bounds. This omission is telling as the 1963 deeds simply provide the Rogers with a reservation of easement rights for a right-of-way for ingress and egress. Accordingly, it was not the intention of the parties in drafting the 1963 deeds that the constructed roadways would remain permanently fixed in one location.

Before this Court, both parties reassert the same arguments. Rogers contends that both roadway and utility easements cannot be moved because they ran appurtenant to the Rogers parcel, and Hunter's Ridge counters that the 1963 Deeds created the ability to move the roadway and utility easements unilaterally, or to exercise an option to move the roadway easement to a road connecting to 75th Avenue.

### III. Discussion

This case involves the interpretation of a deed and subsequent agreements, purportedly creating a roadway easement, as well as easements for water, sanitation and gas. Basically, the issue is whether the servient tenant, Hunter's Ridge, can unilaterally extinguish a roadway easement and establish another roadway easement in its stead.

 "An easement is broadly defined as a nonpossessory interest in the real property of another, and arises through express grant or implication." *Boucher v. Boyer,* 301 Md. 679, 688, 484 A.2d 630, 635 (1984) (citations omitted). An express easement by reservation often arises when a property owner conveys a portion of his property to another, which would otherwise render the retained part inaccessible, so the reser-

vation permits a right-of-way. *Miller v. Kirkpatrick,* 377 Md. 335, 349, 833 A.2d 536, 544 (2003), citing *Knotts v. Summit Park Co.,* 146 Md. 234, 239, 126 A. 280, 281–82 (1924). An easement by implication, on the other hand, "may be created in a variety of ways, such as by prescription, necessity, the filing of plats, estoppel and implied grant or reservation where a quasi-easement has existed while the two tracts are one." *Boucher,* 301 Md. at 688, 484 A.2d at 635 (citations omitted). *See also Atlantic Constr. Corp. v. Shadburn,* 216 Md. 44, 52–53, 139 A.2d 339, 344 (1958) (filing of plats); *Slear v. Jankiewicz,* 189 Md. 18, 23–24, 54 A.2d 137, 139 (1947), cert. denied, 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112 (1948) (quasi-easement), *Greenwalt v. McCardell,* 178 Md. 132, 138, 12 A.2d 522, 525 (1940) (estoppel).[11] In *Boucher,* 301 Md. at 688, 484 A.2d at 635, we further noted that "[a]n implied easement is based on the presumed intention of the parties at the time of the grant or reservation as disclosed from the surrounding circumstances rather than on the language of the deed" and that "[a]s a result, courts often refer to extraneous factors to ascertain the intention of the parties."

"In every instance of a private easement—that is, an easement not enjoyed by the public—there exists the characteristic feature of two distinct tenements-one dominant and the other servient." *Bd. of County Comm'rs of Garrett Coun-*

---

**11.** In *Greenwalt v. McCardell,* 178 Md. 132, 138, 12 A.2d 522, 525 (1940), we explained the principle of an easement by estoppel:

It has long been a familiar principle that when one stands by and sees another making expenditures for improvements to property to which he has some claim or title, and does not give any notice or objection, he cannot afterwards in good conscience assert his own claim or title against the improver. But mere silence or acquiescence or failure to object does not operate as an estoppel against one who permitted the making of the improvements in ignorance of his own rights in the property, or in favor of the one making the improvements, when the means of knowledge of the true state of the title is equally available to both parties. The doctrine of estoppel cannot be invoked against a party who was not under any obligation to speak, and when any protest on his part against expenditures for improving the land would have been an officious interference with the right of the owner to improve the property as he saw fit.

*ty v. Bell Atlantic–Md., Inc.,* 346 Md. 160, 175, 695 A.2d 171, 179 (1997), quoting *Consol. Gas. Co. v. Mayor and City Counsel of Baltimore,* 101 Md. 541, 545, 61 A. 532, 534 (1905). "Where a right of way is established by reservation, the land remains the property of the owner of the servient estate, and he is entitled to use it for any purpose that does not interfere with the easement." *Greenwalt,* 178 Md. at 136, 12 A.2d at 524 (1940). The owner of the dominant tenement is entitled to use the easement in a manner contemplated at the time of the conveyance, while the servient tenant is entitled the use and enjoyment of his property consistent with the terms and conditions of the reservation, *Millson v. Laughlin,* 217 Md. 576, 585, 142 A.2d 810, 814 (1958), and may not obstruct the use of the easement. *Miller,* 377 Md. at 350, 833 A.2d at 544; *Maddran v. Mullendore,* 206 Md. 291, 297, 111 A.2d 608, 610 (1955) ("[I]t is axiomatic that the owner of a servient tenement cannot close or obstruct the easement against those who are entitled to its use in such manner as to prevent or interfere with their reasonable enjoyment.").

An easement reserved in a deed is either general or specific. An easement is reserved in specific terms when its location is easily discernible, such as from a metes and bounds description, a plat map, or a call.[12] An easement is reserved in general terms, when it is clear from the intentions of the parties that an easement has been created, but without a precise location. If the easement is reserved in specific terms, we look no further than the plain meaning of the language in

---

**12.** In *Weems v. County Comm'rs of Calvert County,* 397 Md. 606, 612, 919 A.2d 77, 81 (2007), for example, we defined a "call" as "[a] landmark designating a property boundary":

> And, whatever may be the rule elsewhere, it is well settled in this State that a grant of land by metes and bounds and courses and distances, with *calls* for visible boundaries on the side of a highway; for instance a *call* for a stone planted in the south side of the road, and running thence, by the south side of the road to another stone, *these calls and boundaries will be construed as defining the limits of the property thereby conveyed; and the grantee under such a grant will not take the fee to the middle of the road.*

*Id.* (emphasis in original).

the deed used to describe location and confine our analysis to the four corners of the instrument. *Weems v. County Comm'rs of Calvert County,* 397 Md. 606, 614, 919 A.2d 77, 82 (2007). If, on the other hand, the easement is reserved in general terms only, an ambiguity regarding the location of the easement exists, and we look to the surrounding circumstances, including subsequent agreements and conduct of parties, which may evidence the parties' intent. Judge Dale R. Cathell recently explicated this principle in *Weems,* 397 Md. at 614, 919 A.2d at 82:

> In deeds granting easements, ambiguity only exists when the particular location point at issue cannot be determined, not in instances where the location point is clear from the language of the deed. If there was any ambiguity in respect to language (of which there is none in this case with respect to the boundary at issue) then, in such an event, other evidence might be considered to attempt to locate the right of way. The case *sub judice,* however, is distinguishable from cases in which the Court has found it necessary to look outside the four corners of a granting document.

*Id.* (holding that because the terminal point of the easement was located by a call, the easement was specifically located, and the court's interpretation of the parties' intent was confined to the four corners of the granting instrument).

 An easement may be extinguished or abandoned by subsequent written agreement, *see, e.g., Glenn v. Davis,* 35 Md. 208, 216 (1872) (holding that an agreement by a lessee for years to abandon an easement "would not bind the [the lessor] unless he is a party to it, or it is made with his knowledge and acquiescence"), or by subsequent act. *Chevy Chase Land Co. v. United States,* 355 Md. 110, 733 A.2d 1055 (1999). In *Chevy Chase,* we stated with respect to the abandonment or extinguishment of an easement:

> It is now very well settled, by authorities of the highest character, that a party entitled to a right of way or other mere easement in the land of another may abandon and extinguish such right by acts *in pais,* and without deed or

other writing. The act or acts relied on, however, to effect such result, must be of a decisive character; and while a mere declaration of an intention to abandon will not alone be sufficient, the question, whether the act of the party entitled to the easement amounts to an abandonment or not, depends upon the intention with which it was done, and that is a subject for the consideration of the jury. A cesser of the use, coupled with any act clearly indicative of an intention to abandon the right, would have the same effect as an express release of the easement, without any reference whatever to time.

*Id.* at 159, 733 A.2d at 1081 (internal citations omitted). In *United Finance Corp. v. Royal Realty Corp.*, 172 Md. 138, 147, 191 A. 81, 85 (1937), we further stated that a right associated with an easement may be abandoned or extinguished by acquiescence in a use inconsistent with that right:

[O]ne who, having an easement of way, whether public or private, suffers his right to lie fallow and unused for a long period of time, and throughout the period suffers the owners of the servient tenement not only to use it as though no such right existed, but actually acquiesces in such use by taking taxes or other charges assessed against it or profits therefrom as though no such easement existed, or by permitting any uses of the land inconsistent with the existence of the easement, may be held to have sufficiently manifested such an intention of abandoning the right as will estop him from asserting it.

## A. Roadway Easement

The first issue involves the location of the roadway easements, as opposed to the utility easements. Rogers argues that a roadway easement over the Hunters Ridge property was created for their benefit by the 1963 Deeds and that subsequent amendments, describing the roads as "perpetual," and their use of the roads for more than 35 years, reflect the intention of the parties to the 1963 Deed to affix the easements on three roads traversing the Hunter's Ridge property. Hunter's Ridge contends that the plain language of the 1963

Deed created two options, both of which could be exercised without the consent of Rogers, by Hunter's Ridge as successor in interest to SDN and Landover Gardens.

The trial judge and the Court of Special Appeals both applied a plain meaning analysis to the 1963 Deed and held that the servient tenant unilaterally could move the roadway easement from direct private roads, leading to Landover Road, to a series of public roads, leading to 75th Avenue and then to Landover Road. In so doing, the courts below recognized that general easements were created in the SDN Deed, but did not acknowledge the ambiguity of the easements' location, nor the ambiguity of the location of the easement in the Landover Gardens Deed, resulting from the unavailable site plan, which was referenced therein.

The 1963 SDN Deed reserved an easement in general terms, because it created an option to set the easement either by private or by public roadway, and did not specify the easement's location. The Court of Special Appeals, in fact, recognized the general nature of the reservation, when the panel observed that "if the parties intended that the roadways described would be in one fixed location without alteration, the deeds would have described the roadways to be built as perpetual easements defined by metes and bounds." The existence of the two options in the 1963 Deed, furthermore, exacerbates the ambiguity. The Landover Gardens Deed may have been a specific reservation when made, but the location of the easement became ambiguous by the unavailability of the site plan coupled with the provision calling for "a permanent roadway within said development to provide ingress and egress from Landover Road to [SDN] property ... to be located approximately as shown on the site plan entitled: 'Landover Gardens, Section one, dated 7/16/63.'"

As a result, the ambiguity in both Deeds cannot be resolved by plain meaning analysis, but may be resolved by reference to subsequent declarations and conduct of the parties, evidencing their intent.

## Subsequent Agreements

Three agreements, to which Rogers were a party, were entered into after the 1963 Deed. The first 1964 Declaration, the Driveway Agreement, recited that "the parties hereto desire to clarify their previous understanding regarding the means of ingress and egress to the roadway connecting to Landover Road," and then proceeded to permit the Rogers to construct driveways across SDN property to connect to a road yet to be constructed that would lead to Landover Road. The second 1964 Declaration created a roadway easement for pedestrian and vehicular traffic over SDN property, and, using metes and bounds descriptions, identified Mathias, Loop and Stub Roads. The 1968 Declaration extended Mathias Road to a location closer to the Rogers parcel.

In interpreting these subsequent agreements, the Court of Special Appeals held that "the 1964 and 1968 Declarations, which created Mathias, Loop and Stub Roads, did not expressly nullify or abrogate Hunters Ridge's right, as expressed in the 1963 deeds, to dedicate a public road from the Rogers Property to an existing road that leads to Landover Road." We agree, because none of the roads created in the Declarations connected to the Rogers tract of land until the 1969 court order required the connection.

## Subsequent Conduct

Rather, evidence of subsequent conduct of the parties, including the Rogers' use of an easement and SDN's and Landover Gardens' acquiescence to that use, or the easement's extinction, needs to be adduced on remand of this case, in order to interpret the parties' intent. Independent of the doctrines of adverse user and way of necessity, *Taylor v. Solter*, 247 Md. 446, 452, 231 A.2d 697, 701 (1967), when an easement is granted in general terms, " 'the practical location and use of such a way ... for a long time by the grantor will operate to fix the location.' " *Weems*, 397 Md. at 615–616, 919 A.2d 77, 83 (2007), quoting *Sibbel v. Fitch*, 182 Md. 323, 327, 34 A.2d 773, 774 (1943). In *Sibbel*, Fitch, as the dominant tenant, sought to establish a right-of-way over land conveyed to

Sibbel. Their 1866 Deed had conveyed a tract of land containing 91 1/4 Acres, "saving there out the family graveyard and reserving also a right of way to and from the graveyard." *Id.* at 325, 34 A.2d at 773. From the time of the original deed in 1866 to at least 1918, the right of way to the family graveyard ran along a course labeled the "old road." In 1926, Sibbel completed a new road located solely within his tract, to be used as a driveway to his house. The evidence was uncontradicted that between the years 1926 and 1939, seven Fitch-family funerals took place, all of which traversed the new road. In 1939, Sibbel constructed a barrier fence across the new road, preventing Fitch from using the road to access the graveyard. Fitch, thereafter, sought to enforce his roadway easement over the new road, claiming that Sibbel's acquiescence in his family's use of the new road altered the location of the easement from the old road to the new road.

· The trial judge agreed with Fitch and awarded an easement over the new road, based on the general grant and Sibbel's acquiescence to its use. Sibbel appealed to this Court and we reversed, holding that where an easement reserves "a right of way in general terms, without defining its location by metes and bounds," the use of the easement for a long time in a specific location "raises an inference that the owners of the dominant and servient tenements had agreed upon the metes and bounds," and the easement's location "thereby became fixed as if it had been described in the deed ... by metes and bounds." *Id.* at 326, 34 A.2d at 774. In reaching this conclusion, we explained:

> [A]fter the location of the right of way which has been granted in general terms has been defined and fixed by the owners of the dominant and servient tenements by user in a particular location over a long period of time, it becomes as definitely established as if the grant or reservation had so located it by metes and bounds and the location of the right of way as thus defined can only be changed by agreement of the owners of the dominant and servient tenements.

> "Where an easement in land, such as a way, is granted in general terms, without giving definite location and descrip-

tion of it, the location may be subsequently fixed by an express agreement of the parties, or by an implied agreement arising out of the use of a particular way by the grantee and acquiescence on the part of the grantor, provided the way is located within the boundaries of the land over which the right is granted. *As otherwise expressed, it is a familiar rule, that, when a right of way is granted without defined limits, the practical location and use of such way by the grantee under his deed acquiesced in for a long time by the grantor will operate to fix the location. The location thus determined will have the same legal effect as though it had been fully described by the terms of the grant."* 28 C.J.S., *Easements,* Sec. 82.

This principle has been approved in the Maryland case of *Stevens v. Powell,* 152 Md. 604, 137 A. 312, 313, where the court says: "While the deeds providing for the right of way over an 'eight-foot alley' do not describe its exact location in the area, of greater width, through which it passes, yet the definition of its course by actual user during the period of its enjoyment by the dominant, and its recognition by the servient, owners, is a sufficient identification of the way for the purposes of this proceeding."

\* \* \*

When a right of way reserved in general terms has been definitely located and the owner of the dominant tenement has acquired vested right in the way as located, the general rule is that the location of the way can be changed only by agreement of the owners of the dominant and servient tenements.

"As a general rule, in the absence of contrary statute, the location of an easement when once established cannot be changed by either party without the other's consent except under the authority of a grant or reservation to this effect." 28 C.J.S., Easements, Sec. 84.

*"A way once located can not be changed by either party without the consent of the other. When the right of way has once been exercised in a fixed and definite course, with full acquiescence and consent of both parties, it can not be*

*changed at the pleasure of either of them."* Jones, *Easements*, 1898 Ed., Sec. 352.

*"The general rule is that the location of an easement once selected cannot be changed by either the landowner or the easement owner without the other's consent."* 17 Am.Jur., Easements, Sec. 87.

*Id.* at 327–28, 34 A.2d at 774–75 (emphasis added). Accordingly, we concluded that Sibbel was entitled to construct a barrier across the new road, because the easement reserved by the 1866 Deed was fixed as the old road, as used by the Fitches to access the graveyard for more than fifty years. *Id.* at 329, 34 A.2d at 775.

In *Taylor,* 247 Md. at 446, 231 A.2d at 697, we revisited our holding in *Sibbel,* when determining that subsequent conduct of parties can operate to set the location of an easement when the deed reserving the easement is either imprecise or, based on the facts and circumstances, incorrect. In that case, Taylor's deed reserved a roadway easement over the "western" part of his parcel to the Solter tract. *Id.* at 448, 231 A.2d at 698. An earlier deed between predecessors in interest created a roadway over the eastern part of the Taylor property. Taylor argued that he possessed a unilateral ability to extinguish the eastern roadway easement. The evidence at trial, however, supported the existence of the eastern easement, and that no roadway ever existed on the western part of the Taylor property. Five people, who had either lived, worked or hunted on nearby parcels testified that the eastern road existed unchanged from 1921 and 1959, and notably, an oil delivery worker testified that between 1951 and 1952—after the conveyance reserving the easement, but before the parties obtained ownership—he had traversed the eastern road on the Taylor parcel to deliver oil to the Solter parcel. The trial judge determined, on the basis of the evidence, that the parties' intended to grant an easement over the eastern road, and we affirmed.

We reflected that it appeared that the use of the term "west side" in the deed constituted "obvious inadvertence on the part

of the draftsman," and that subsequent agreements between the adjacent parcel holders regarding the road, the Talyor's concession that the Solters enjoyed some right of access across their property, and the use of the road for years operated to fix the easement. *Id.* at 452, 231 A.2d at 701. In so holding, we quoted from *Sibbel* and determined that the use of the easement operated to fix its location, despite the fact that the deed failed to accurately describe it: "In our judgment the case at bar falls comfortably within the familiar rule stated in *Sibbel v. Fitch,* 182 Md. 323, 326–27, 34 A.2d 773, 774 (1943). . . ." *Id. See also Weeks v. Lewis,* 189 Md. 424, 427, 56 A.2d 46, 47 (1947) (also relying on the rule in *Sibbel* to set the location of an easement).

More recently in *Weems,* 397 Md. at 606, 919 A.2d at 77, we held that *Sibbel's* ambiguity analysis did not apply to the interpretation of a deed reserving an easement by specific grant—or one explicitly defining the easement's location. Weems had sought declaratory relief to set the terminal point of a public easement of way over Leitch's Wharf Road—an easement granted to Calvert County by the land's former owner, Lydia Leitch, in a 1949 deed of conveyance.[13] The

---

13. The language of the 1949 Deed at the heart of the controversy provided:

> "2. The remaining of the above mentioned parties of the first part do hereby grant a parcel or strip of ground beginning for the same at the intersection of the present County road, and the land of Thomas I. Weems and Clifton Smith, and running in a westerly direction adjacent to and through the lands of the above mentioned parties of the first part, and running with the center of the said present county road, said 30 foot strip lying 15 feet on each side of the center line thereof, and *having for its westerly terminal the lands of the grantor, Lydia Leitch.*" [Emphasis added.]

Section 15–201 of the Calvert County Code at that time further stated:

**Subtitle 2**

**Access to Wharves and Landings**
§ 15–201. **Established. [Code 1981, § 15–101, 1985, ch 715, § 2]**
(a) The public shall have an easement or right-of-way over any roads or ways in Calvert County leading to . . . Leitch's Wharf
. . .

particular language of the deed, reserving a right-of way to Leitch's Wharf for public use, stated that the easement's westerly terminus was "the lands of the grantor, Lydia Leitch." *Id.* at 611, 919 A.2d at 80. Weems argued that the lands of Lydia Leitch ended at a turnaround point on Leitch's Wharf Road and that, therefore, Weems could restrict public access between the turnaround point on the road and the barrier wall at the end of the road, abutting the Potomac River and the area known as Leitch's Wharf. Calvert County, conversely, argued that the grant of the easement was a general one, that the use of the road all the way to the barrier had fixed the location of the easement over that area, and also that the Calvert County Code, which stated "that the public shall have an easement or right-of-way over any roads or ways in Calvert County leading to ... Leitch's Wharf," precluded Weems from restricting use after the turnaround point. *Id.* at 611, 919 A.2d at 81.

In the first trial, the judge determined that the easement extended over the paved portion of Leitch's Wharf Road, past the turnabout, to the barricade. A panel of the Court of Special Appeals then concluded that the 1949 deed was ambiguous, and remanded for fact finding.

During proceedings on remand, both parties presented additional evidence regarding Lydia Leitch's intent when executing the 1949 deed to reserve a right-of-way easement for the public. Weems proffered testimony that the deed's language created a specific terminus point, the lands of Lydia Lynch, so that westerly terminus of the easement had to be the turnaround point, because that was the borderline of Lydia Leitch's land after the 1949 conveyance. Calvert County's expert proffered that the easement was intended to extend to the barrier at the end of Leitch's Wharf Road. The trial judge concluded that the easement was intended to extend all the

---

(b) The purpose of this easement or right-of-way is solely for access to the wharves and landings and enjoyment of the wharfs and landings by the public.

*Weems v. County Comm'rs of Calvert County,* 397 Md. 606 at 611, 919 A.2d at 80–81.

way to the barrier and that even if it did not, the Calvert County Code prevented Weems from restricting the public's access to Leitch's Wharf over Leitch's Wharf Road.

We granted certiorari on our own initiative. Before us, Weems argued, in part, that the trial judge erred by "arbitrarily disregarding [his] expert's opinion," regarding the plain meaning of the deed locating the easement, and by thereafter finding "that the westerly terminal of the easement granted in the 1949 Deed, was located within Appellant Weems' property" at the barrier wall. *Id.* at 610, 919 A.2d at 80. After we distinguished a general reservation of an easement from a specific one, we concluded that the language, "having for its westerly terminal the lands of the grantor, Lydia Leitch," constituted a "call," or a landmark clearly demarcating the location of the public right-of-way easement. *Id.* at 612, 919 A.2d at 81. Because we regarded the call as specific, we looked to the plain meaning of the deed and agreed with Weems that the easement terminated at the turnaround point:

In the case *sub judice*, it is clear that the western boundary of the easement ends at the Leitch property, not within the property, and not at the westerly boundary of the property, but at the very point where the easement first touches the then property of Lydia Leitch (extant from the record as marked on the various photographs and maps as the turnaround). This clearly and unambiguously demarcates the westerly point of the right-of-way as described in the deed. There is no dispute as to the other boundaries of the easement relevant to the instant case. This case only concerns the western boundary of the public easement. The County has no rights, under this easement, beyond that point. On that issue, there is no ambiguity in regard to the easement. When the Court of Special Appeals first addressed the issue, that court should not have remanded the case. It should have found the contested description in the easement to be unambiguous as we do today.

*Id.* at 613–14, 919 A.2d at 82.

In the absence of a specific location or a "call," as in the present case, subsequent conduct can elucidate use by the

dominant tenant and acquiescence, if any, by the servient tenant, both with respect to affixing the location of an easement and regarding the extinguishment or abandonment of an easement or an option to place an easement in one location in lieu of another. Evidence of subsequent conduct, on remand, must be adduced, in order to declare the rights of the parties.

 Hunters Ridge, however, also has asserted that the language of the 1963 Deed conferred upon it a unilateral ability, irrespective of usage and acquiescence, to relocate or extinguish existing easements. Specifically, Hunters Ridge relies on the last clause from the following section of the SDN Deed,

> or in lieu of such private roadway, the [SDN] may dedicate and construct a public roadway across the herein described property which will provide a means of access to Landover Road or to an existing public roadway leading to Landover Road and it is further agreed that in the event [SDN] ha[s] failed to do so on or before the date said retained property is offered for sale to [SDN], its successors or assigns, or in any event on or before five (5) years from date hereof, then and in that event the parties of the first part shall have the right to construct a roadway not more than thirty (30) feet wide across the herein described land to connect to the then existing private roadways constructed by the [Rogers] it shall be constructed and maintained by said parties of the second part leading to Landover Road; any such roadway to be located approximately as shown on the site plan entitled "Landover Gardens, Section One, dated July 16, 1963" or at such other location as the parties hereto or their respective heirs, successors or assigns may agree and in the event any such roadway is constructed by the [Rogers] it shall be constructed and maintained by said parties for the exclusive use of [the Rogers], and their agents, guests, or assigns, unless and until such time as [SDN] agree[s] to maintain said roadway, at which time [SDN] shall have the right to use said roadway in common with the [Rogers]; and [SDN], its successors and assigns, shall have the right, at its expense, to relocate any portion of said roadway, any such

> relocated portion to be of comparable quality and construction.

and a similar clause in the Landover Gardens Deed,

> said roadway to be located approximately as shown on the site plan entitled: "Landover Gardens, Section One, dated 7/16/63" and to be not less than 22 feet wide and to be maintained by [Landover Gardens], its successors and assigns, unless the same is dedicated to public use, and it is further agreed that in the event said permanent roadway has not been so constructed within two years from the date hereof then and in that event, the [Rogers], their heirs and assigns, shall have the right to construct a roadway not more that 30 feet wide across the herein described land to be located approximately as shown on the above described site plan or at other such location as the parties hereto, their heirs, successors or assigns, may agree; it being agreed that in the event the [Rogers] construct said roadway that in such event said roadway shall be constructed and maintained by said parties and shall be for the exclusive use of said parties and their agents, guests, invitees unless and until such time as the [Landover Gardens] agree[s] to maintain said roadway, at which time [Landover Gardens] shall have the right to use the roadway in common with the [Rogers]; and [Landover Gardens], its successors and assigns, shall have the right, at its expense, to relocate any portion of said roadway, and such relocated portion to be of comparable quality and construction.

In essence, Hunter's Ridge argues that the last sentence permits it to relocate any roadway at its expense, so long as the relocated portion is of a comparable quality and construction. Rogers, conversely, argues that the last sentence, permitting relocation, applies only to that roadway that would have been constructed by Rogers in response to SDN's or Landover Gardens' failure to build a roadway within the time limits provided. We agree with Rogers regarding the interpretation of this last sentence, as did the trial judge and the panel of the Court of Special Appeals.

### B. Utility Easement

We shall only briefly address the utility easements, for we adopt the conclusions of the trial judge and the Court of Special Appeals in this respect. Rogers argues that Hunter's Ridge cannot relocate or extinguish the utility lines on Hunter's Ridge property, because the memorandum appended to the 1963 Deed reserved a right to hook into these lines at the Rogers' expense, and the subsequent declarations created easements specifically locating the utility lines on the SDN and Landover Gardens properties. In essence, Rogers argues that the utility easements created in subsequent declarations were for the benefit of their land and cannot now be moved. Hunter's Ridge counters that the easements were created solely for the benefit of the SDN and Landover Gardens apartment buildings, and can be moved because they are located wholly within Hunter's Ridge property, and Rogers has no right to set their location.

The trial judge found, and it is not disputed, that the Rogers never exercised their right to hook into the SDN or Landover utility lines. Thus, unlike the roadway easement previously discussed, issues of subsequent use and acquiescence do not arise to fix the location of the utility easements. The trial judge held, with respect to the plain meaning of the declarations creating the utility easements, that he could not conclude that the "easements that were put in place on the Landover and SDN property were for anything other than the connection and construction to the various apartments, which were constructed and might have been constructed . . . ." In affirming, the Court of Special Appeals aptly noted that the 1964 Declaration stated that the easements were "to serve the apartments intended to be constructed on the property," and that the plain meaning of this language indicates that the easements were not for the benefit of the Rogers Property, and recognized that the Rogers were not a party to the 1968 "Declaration of Easements for Purposes of Ingress and Egress for Water and Sanitary Sewer," nor could the Rogers property be construed to be a third party beneficiary of the

declaration, as the language, to "serve the apartments to be built thereon," clearly stated the Declaration's purpose.

Because it is undisputed that Rogers never used the utility easement, no issue of subsequent conduct arises, and we agree with the conclusion that the utility easements were not placed on Hunter's Ridge property with the intent to benefit the Rogers parcel.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR THE FILING OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**