DECISION
This matter came before the Court for a jury-waived trial held July 12 through July 14, 2010. This case centers around four special assessments issued by the Defendant Moorland Farm Condominium Association (hereinafter the "Association" or "Defendant") to pay for deck replacements for Phase I condominiums at the Moorland Farm Condominium (hereinafter, "Moorland Farm"). The Plaintiffs' Declaratory Judgment Claim (Count I) on whether these decks are a "common area," a "limited common area," or a part of the individual condominium units under both the Moorland Farm Condominium Declaration (hereinafter the "Declaration") and the Moorland Farm Condominium By-laws (hereinafter the "By-laws") and Defendant's corresponding counterclaim for any unpaid special assessment fees are the only remaining claims for this Court to decide, the others having been dismissed by stipulation. Jurisdiction is pursuant to G.L. 1956 § 9-30-1 et. seq. *Page 2 
 I Rule 52 Standard
Rule 52(a) of the Rhode Island Superior Court Rules of Civil Procedure provides that "in all actions tried upon the facts without a jury . . . the court shall find the facts specifically and state separately its conclusions of law thereon. . . ." As a non-jury trial, resolution of the instant dispute requires the trial justice to sit "as trier of fact as well as law," to weigh and consider the evidence, to determine the credibility of witnesses, and to draw inferences from the evidence presented. Hood v. Hawkins,478 A.2d 181, 184 (R.I. 1984). See also Rodriques v.Santos, 466 A.2d 306, 312 (R.I. 1983) (holding that the question of who is to be believed is one for the trier of fact). Rule 52(a) does not necessitate "extensive analysis and discussion of all the evidence"; rather, "brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case." Donnelly v. Cowsill,716 A.2d 742, 747 (R.I. 1998) (quoting Anderson v. Town of E.Greenwich, 460 A.2d 420, 423 (R.I. 1983)).
 II Findings of Fact
In considering all of the credible testimony and other evidence presented, the Court finds as follows:
 1. Moorland Farm is a condominium, located in Newport, Rhode Island, established by a "Declaration of Condominium" dated September 15, 1980 (hereinafter, the "Declaration"). (Joint Ex. 31 ¶ 1 2; Joint Ex. 1.)
 2. On September 13, 1980, the Declaration was recorded in the Condominium Land Evidence Records of the City of Newport. (Joint Ex. 31 ¶ 3; Joint Ex. 1.) *Page 3 
 3. The plans for Phase I were recorded in 1979 in the Condominium Land Evidence Records of the City of Newport and approved by the Association. (Joint Ex. 31 ¶ 11; Joint Ex. 1; Joint Ex. 35.)
 4. On or about December 29, 1983, the First Amendment to the Declaration was recorded with the City of Newport adding Phases II and III (Units 13 through 33) to Moorland Farm. (Joint Ex. 31 ¶ 4; Joint Ex. 2.)
 5. Moorland Farm is comprised of thirty-three (33) Units and ten (10) Resident Buildings, plus a Pool Building and a Garage Building. (Joint Ex. 31 ¶ 9).
 6. The Declaration provides for two basic condominium units in Phase I: a two-story unit of approximately 2,478 square feet, designated as an "A Unit," and a three-story unit of approximately 3,876 square feet designated as a "B Unit." (Joint Ex. 1 § 3.)
 7. Section 3 of the Declaration identifies three phases of construction at Moorland Farms. (Joint Ex. 31 ¶ 10; Joint Ex. 1 § 3.)
8. Phase I consists of the Units in three buildings known as Cardinal House, Pheasant House, and Robin House. (Joint Ex. 31 ¶ 11.)
 9. Phase I Units were constructed before the construction of the Phase II and Phase III Units. (Joint Ex. 31 ¶ 13.)
 10. Phase II consists of the Units in three buildings known as Gull House, Quail House, and Blue Jay House. (Joint Ex. 31 ¶ 14.)
 11. Phase III consists of the Units in four buildings known as Heron House, Warbler House, Sparrow House, and Finch House. (Joint Ex. 31 ¶ 15.)
 12. Plaintiffs Charles Burns (Unit 23, Blue Jay House), Peter D'Amario (Unit 21, Blue Jay House), Patricia Ganek (Unit 14, Gull House), Richard H. Koziara (Unit 28, Warbler *Page 4 
House), Anne Liddell (Unit 26, Heron House), Charles and Selena Mangan (Unit 19, Quail House), Jane McCool (Unit 32, Finch House), Paul Miller (Unit 23, Blue Jay House), Leslie Parks (Unit 29, Warbler House), Michael and Elyse Spalding (Unit 22, Blue Jay House), and Bernard and Barbara Ward (Unit 33, Finch House) own units, or serve as trustees of trusts that own units, in Phases II and III at Moorland Farm. (Joint Ex. 31 ¶ 19.)
 13. Each Phase I unit has at least one or two rear decks. (Joint Ex. 31 ¶ 16; Joint Ex. 33; Joint Ex. 35.)
 14. Each Phase I unit also has two pocket decks. (Pls.' Ex. 33; Pls.' Ex. 35.)
 15. The decks of a unit (including pocket decks), if any, are for the private, exclusive benefit and use of the unit to which they are connected. Use and enjoyment of such decks is restricted to the individual unit owner(s) and their invited guests. (Pls.' Ex. 32, Pls.' Ex. 33.)
 16. Except for a few certain lower rear decks that have steps leading to the ground, access to all decks of a unit is only through the unit itself. Id.
 17. Each Phase I unit has an "entry court area." Each entry court area leads to a particular Unit. The entryways — i.e. the steps leading into the unit and consisting of decking material — of each Phase I unit are within the entry court areas. (Pls.' Ex. 33; Pls.' 35.)
 18. The entry court area of a unit, if any, is for the private, exclusive use of the unit to which it is appurtenant. Use and enjoyment of such entry court area is restricted to the individual unit owner(s) and their invited guests. (Joint Ex. 31 ¶ 18.)
 19. The Declaration and the By-laws of Moorland Farm Condominium Association (Pls.' Ex. 1 Ex. D, hereinafter "By-laws") govern the Association and are binding on the *Page 5 
Management Committee, its members, and all unit owners. (Joint Ex. 31 ¶ 33, 42, 45, 50 51; Pls.' Ex. 1 §§ 14 18; By-laws Art. I III.)
 20. The Declaration and By-laws provide that the provisions of the Rhode Island Condominium Act, Title 34, Chapter 36, govern Moorland Farm. (Joint Ex. 31 ¶ 33, 42, 45, 50 51; Pls.' Ex. 1 §§ 3, 14 18; By-laws Art. I § 1.)
 21. The Management Committee is obligated to enforce the "obligations of Unit Owners pursuant to and in accordance with provisions of said Rhode Island Condominium Act, Title 34, Chapter 36, said Declaration and these By-laws." (Joint Ex. 31 ¶ 51; By-laws Art. III § 1(l).)
 22. The Declaration specifically states that "[a]ll units have attics, fireplaces, exterior natural wood decks, and an attached one-car garage." (Joint Ex. 31 ¶ 34; Joint Ex. 1 § 3) (emphasis added).
 23. Section 5 of the Declaration, entitled "Description of Units," specifically incorporates the features included in Exhibit B in the description of the actual condominium units. It states, in part:
 "The condominium units and the designations, locations, approximate area, number of rooms, immediate accessible common areas, and other descriptive specifications thereof, are shown on the Moorland Farm Condominium Plan, thereinafter referred to, and as specified and described in Exhibit `B' hereto annexed and incorporated herein. In addition to the rooms specified, each unit contains and includes an entrance, hallways, closets, and internal stairways. The approximate square foot area stated in Exhibit `B' is measured to interior finished walls." (Joint Ex. 31 ¶ 36; Pls.' Ex. 1 § 5) (emphasis added).
 24. Exhibit B to the Declaration, entitled, "Condominium Unit Designation and Description" lists "Outside Deck" in the "Code of Features" for units, together with "Living Room," "Dining Room," "Kitchen," "Breakfast Area," "Family Room," "Bedrooms," "Bath," *Page 6 
"Lavette," "Utility/ Laundry," and "Garage." (Joint Ex. 31 ¶ 46; Joint Ex. 1 Ex. B) (emphasis added).
 25. In contrast, Section 7 of the Declaration specifically delineates the "common areas and facilities" of Moorland Farm:
 "(a) the land described in Exhibit `A' hereto annexed, together with the benefit of and subject to the rights and easements referred to in said Exhibit `A'; (b) the foundations, structural columns, girders, beams, supports, exterior walls, and roof of the building; (c) all conduits, ducts, pipes, plumbing, wiring, chimneys, flues, heating equipment, and other facilities for the furnishing of utility service which are contained in portions of the building contributing to the . . . structure or support thereof, and all such facilities contained within any Unit which serve parts of the Condominium project other than the Unit within which such facilities are contained; (d) the walls between Units and between Units and common areas; (e) the common lobbies, vestibules, stairways, corridors shown on the Moorland Farm Condominium Plans, hereinafter referred to; (f) the entrances, entry court areas, and exits of the building, and the outside steps, porches, yards, lawns, driveways, parking area, outbuildings, plans, and walkways, and the improvements thereon." (Joint Ex. 31 ¶ 38; Joint Ex. 1 § 7.)
 26. Decks of individual units at Moorland Farm are not identified or otherwise designated as a common area. Id.
 27. Except for Section 7 of the Declaration, the terms "porch" or "porches" do not appear in the Declaration, the By-laws, or the 1979 Phase I Plans. (See generally Joint Ex. 1; By-laws; Pls.' Ex. 35.)
 28. The terms "porch" or "porches" do not appear in the Condominium Act. See G.L. 1956 § 34-36-1, et seq.
 29. The elements identified as "decks" on the 1979 Phase I Unit Plans are not the "porches" identified in Section 7 of the Declaration. *Page 7 
 30. The common areas and facilities at Moorland Farm "are intended to be used for the operation, support and maintenance of the Condominium Project and the comfort and convenience of the Unit Owners." (Joint Ex. 31 ¶ 41; Joint Ex. 1 § 11(b).)
 31. Unit owners of Phases II and III, however, are not permitted to use Phase I unit owners' decks and entry court areas without the Phase I unit owners' permission. Phases II and III unit owners also lack decision-making authority in connection with the Phase I unit owners' decks and entry court areas.
 32. The Declaration identifies as "limited common areas," the "facilities in which the Unit or Units hereinafter specified shall have appurtenant thereto an exclusive right and easement of use." It specifically designates the "entry court area" of a unit as a limited common area "for the private, exclusive use of and appurtenant to such Unit." (Joint Ex. 31 ¶ 38; Joint Ex. 1 § 7.)
 33. According to the Declaration, limited common areas are to be maintained by the unit owners at their own expense:
 "Each Unit, including particularly without limiting the generality, the exterior doors and windows thereof and entry court area, shall be properly maintained by the owners of such Unit at such owner's own expense, subject to and in accordance with the By-Laws of the Moorland Farm Condominium Association and rules and regulations promulgated pursuant thereto." (Joint Ex. 31 ¶ 37; Joint Ex. 1 § 5.)
 34. Decks of individual units at Moorland Farm are not identified or otherwise designated as a limited common area. (Joint Ex. 31 ¶ 38; Joint Ex. 1 § 7.)
 35. The Management Committee reaffirmed the individual unit owners' obligation to maintain the entry court areas appurtenant to their unit, stating: "[a]fter having reviewed the by-laws, the management committee agreed that the garage doors, as well as the other *Page 8 entrances to condominiums are the responsibility of the individual owners." (Pls.' Ex. 34) (emphasis added).
 36. Each unit owner has a percentage of undivided interest in the common areas, limited common areas, and facilities based on the "approximate assignable area" (i.e. square footage) of each unit. (Joint Ex. 31 ¶ 39; Joint Ex. 1 § 10.)
 37. According to "Exhibit B" to the Declaration, the "approximate assignable area" of each unit at Moorland Farm consists of "interior living area plus a percentage of deck space, garage space and attic space with at least 6' clearance." (Joint Ex. 31 ¶ 47; Joint Ex. 1 Ex. B) (emphasis added).
 38. According to "Exhibit B" and "Exhibit C" to the Declaration, the figures of 2,478 square feet and 3,876 square feet are utilized as the "approximate assignable area" in calculating each unit's "percentage of undivided interest in common areas and facilities." The "A Units" with an "approximate assignable area" of 3,876 square feet have a greater "undivided percentage of interest in common areas and facilities" than the "B Units" with an "approximate assignable area" of 2,478 square feet because the "A Units" have larger decks than the "B Units." (Joint Ex. 31 ¶ 48 49; Joint Ex. 1 Exs. B C.)
 39. The "A Units" have a larger ownership interest in the common areas and greater voting rights based on the larger decks associated with the "A Units."
 40. The recorded plans for Phase I also associate the decks of an individual unit as part of the unit to which they are connected. (Pls.' Ex. 33.)
 41. The Management Committee is charged with, among other duties, the "[d]etermination of the common expenses required for the affairs of the Condominium" and the *Page 9 
"[a]ssessment and collection of the common charges from the Unit Owners." (Joint Ex. 31 ¶ 51; By-laws Art. III §§ 1(b) (c).)
 42. "The Management Committee shall expend common funds only for common expenses and lawful purposes permitted hereby and by provisions of said Title 34." (Joint Ex. 31 ¶ 55; By-laws, Art. V § 1(e)) (emphasis added).
 43. On April 12, 2006, the Management Committee notified each unit owner of a special assessment to replace the decks and entry court areas in Phase I at the Robin House (Units 1-4). The special assessment was $205,600 with "A Units" to pay $8,600 and "B Units" to pay $5,500. (Joint Ex. 31 ¶ 62 63; Joint Ex. 11.)
 44. After objections were raised by Association members about the first special assessment, the Management Committee sought a legal opinion from the firm of Tillinghast Licht, LLP, which opined that the assessments were illegal. The Management Committee then sought another opinion from Joseph H. Olaynack, III of Corcoran, Peckham Hayes. Thereafter, the Management Committee reinstated its decision as to this special assessment on August 23, 2006. (See Joint Ex. 31 ¶ 67, 71 72; Joint Exs. 13 15.)
 45. On June 23, 2007, the Management Committee notified each unit owner of a second special assessment to replace the decks and entry court areas in Phase I at the Cardinal and Pheasant Houses (Units 5-12). The second special assessment was $500,000 with "A Units" to pay $21,495 and "B Units" to pay $13,742. (Joint Ex. 31 ¶ 75-78; Joint Ex. 16.)
 46. On June 3, 2008, the Management Committee notified each unit owner of a third special assessment for, among other things, work currently being carried out in Phase I at the Pheasant and Cardinal Houses (Units 5-12). The third special assessment was $180,000 *Page 10 
with "A Units" to pay $7,738.22 and "B Units" to pay $4,947.06. (Joint Ex. 31 ¶ 84-87; Joint Ex. 21.)
 47. On November 3, 2008, the Management Committee notified each unit owner of a fourth special assessment to, among other things, replace pocket decks in Phase I at the Robin, Pheasant and Cardinal Houses (Units 1-12). The fourth special assessment was $100,050 with A Units to pay $4,300 and B Units to pay $2,750. (Joint Ex. 31 ¶ 90-92; Joint Ex. 23.)
 48. Phases II and III unit owners received no benefit from the replacement of the decks and entry court areas in Phase I. (Pls.' Ex. 32 at 116-18)
 49. In total, from 2006 through 2009, the Association assessed $985,650 in special assessments to the Unit Owners at Moorland Farm. (Joint Ex. 31 ¶ 95.)
 50. Premier Property Management originally classified all of the expenses in connection with the repair and replacement of the decks (including pocket decks) and entry court areas carried out by Innovative Construction and Kiwi Construction as "deck repairs" until November 2008. (Joint Ex. 31 ¶ 96; Joint Exs. 24, 25 26.)
 51. In 2006, deck and entry court area replacement costs totaled $119,739.73. (Joint Ex. 24.)
 52. In 2007, deck and entry court area replacement costs totaled $157,878.35. (Joint Ex. 25.)
 53. In 2008, deck and entry court area replacement costs totaled $391,926. (Joint Ex. 26.)
 54. In November 2008, Christopher Bouzaid, a Phase I unit owner, reclassified the construction expenses detailed on the Association's General Ledger for 2008 to reduce deck and entry court area costs by $151,517. Among other reclassifications, expenses related to the replacement of pocket decks were transferred to "roof repairs." (Joint Ex. 31 ¶ 97; Joint Exs. 26, 27 28.) *Page 11 
 55. During the so-called "reclassification" process, Bouzaid also changed the expense category from "decks" to "porches." (Joint Exs. 26 27.)
 56. Bouzaid admitted his so-called "reclassification" process "probably isn't the world's most accurate system," which is an understatement.
 57. In 2009, deck and entry court area replacement costs totaled $5,742. Pocket decks costs, now classified as "new roofs," totaled $11,317. (Joint Ex. 30.)
 58. According to the unmanipulated books and records of the Association, the Phase I deck and the stairways of the entry court areas costs total $669,544.08. The unmanipulated books and records are the best and only relevant evidence of the costs for the replacement of Phase I decks and entry court areas. (See Joint Exs. 24, 25, 26, 27, 28 30.)
 59. The Management Committee Treasurer, Defendant Thomas Flynn, admitted that the Association spent approximately $700,000 to replace the decks and the stairways of the entry court areas in Phase I.
 60. Bouzaid admitted that, even after his so-called "reclassification" of the books and records of the Association, the Phase I deck and stairway of the entry court area replacement costs were nearly $630,000. (Pls.' Ex. 32 at 118-21.)
 III Conclusions of Law
The parties have analogized the documents at issue — the Declaration, By-laws, and the 1979 Phase I Plans — to various documents forming a contract. "When a contract is determined to be clear and unambiguous, then the meaning of its terms constitute a question of law for the court." Young v. Warwick RollermagicSkating Center, Inc., 973 A.2d 553, 558 (R.I. 2009) (quotingCassidy v. Springfield Life Insurance Co.,106 R.I. 615, 619, 262 A.2d 378, 380 (1970)) (internal citations omitted). To determine if any ambiguity exists, the Court will read the *Page 12 
documents in their entirety, giving words their plain, ordinary, and usual meaning. See id. (quoting Mallane v. Holyoke MutualInsurance Company in Salem, 658 A.2d 18, 20 (R.I. 1995)). Where a written instrument is ambiguous, the Court may consider evidence which completes or clarifies a written instrument. See SupremeWoodworking Co. v. Zuckerberg,82 R.I. 247, 252, 107 A.2d 287, 290 (1954). A written instrument "is ambiguous only when it is reasonably and clearly susceptible to more than one interpretation." Paul v. Paul,986 A.2d 989, 993 (R.I. 2010). "[T]he language of an agreement . . . is not rendered ambiguous simply because the parties in litigation differ concerning its meaning." Young,973 A.2d at 560 (quoting City Investing Company LiquidatingTrust v. Continental Casualty Co.,624 A.2d 1191, 1198 (Del. 1993)). Thus, if the terms of an agreement are "clear and unambiguous, judicial construction is at an end for the terms will be applied as written." Id. at 559 (quotingRivera v. Gagnon, 847 A.2d 280, 284 (R.I. 2004)).
Here, the Declaration states that "[a]ll units have attics, fireplaces, exterior natural wood decks, and an attached one-car garage." (Joint Ex. 1 § 3) (emphasis added). Additionally, Exhibit B to the Declaration, entitled, "Condominium Unit Designation and Description" lists "outside deck" as a feature of the condominium unit. (Joint Ex. 1 Ex. B.) Likewise, Section 5 to the Declaration, entitled "Description of Unit," specifically incorporates the features included in Exhibit B in the description of the condominium units. (Joint Ex. 1 § 5.) The Declaration also provides a comprehensive list of common areas, and this list does not include "decks." (See Joint Ex. 1 § 7.)
Further, each unit owner also has a percentage of undivided interest in the common areas, limited common areas, and facilities. (Joint Ex. 1 § 10.) This undivided interest is calculated based on "the approximate proportion which the assignable square feet ineach Unit bears to the *Page 13 
total of the assignable square feet in all the Units."Id. (emphasis added). The approximate assignable area of each unit consists of "interior living area plus a percentage ofdeck space, garage space and attic space."Id. (emphasis added). Thus, under the Declaration, greater deck space in a unit results in greater voting rights and a greater ownership percentage of the common areas for a unit.
The Condominium Act, like the Declaration, establishes that the decks are not common areas. Section 34-36-3(3) provides a definition for "common areas and facilities." It states:
 "`Common areas and facilities,' unless otherwise provided in the declaration or lawful amendments thereto, means and includes: (i) The land on which the building is located; (ii) The foundations, columns, girders, beams, supports, main walls, roofs, halls, corridors, lobbies, stairs, stairways, fire escapes, and entrances and exits of the building; (iii) The basements, yards, gardens, parking areas, and storage spaces; (iv) The premises for lodging of janitors or persons in charge of the property; (v) Installations of central services such as power, light, gas, hot and cold water, heating, refrigeration, air conditioning, and incinerating; (vi) The elevators, tanks, pumps, motors, fans, compressors, ducts, and in general all apparatus and installations existing for common use; (vii) Such community and commercial facilities as may be provided for in the declaration; and (viii) All other parts of the property necessary or convenient to its existence, maintenance, and safety, or normally in common use." Id.
This definition does not include "decks," and the Declaration does not provide otherwise. Similarly, the Phase I Plans, which are recorded in the Condominium Land Evidence Records of the City of Newport and were adopted by the Association, also associate the decks of a unit as part of the unit to which they are connected. (See Pls.' Ex. 33.) Indeed, the decks of a unit cannot constitute common areas because they are for the private, exclusive benefit and use of the unit to which they are connected. Use and enjoyment of such decks is restricted to the individual unit owners and their invited guests and to the exclusion of other unit owners. Thus, based on *Page 14 
the clear and unambiguous language of the documents, as well as the Condominium Act, the Court holds that the decks are part of the individual condominium units.
Defendant argues that the "porches" included in the list of common areas in the Declaration are actually the "decks" in question. (See Joint Ex. 1 § 7(f).) This argument, however, is unpersuasive. First, the terms "porch" or "porches" do not appear anywhere else in either the Declaration, Phase I Plans, or the By-laws. (See generally Joint Ex. 1; By-laws; Pls.' Ex. 35.) Further, the terms "porch" or "porches" do not appear in the Condominium Act. See G.L. 1956 § 34-36-1, et seq.
Defendant is correct to cite McMahon v. McMahon for the proposition that "every word of [a] contract should be given meaning and effect." 967 A.2d 818, 819 (R.I. 2008) (quotingAdrukiewicz v. Andrukiewicz, 860 A.2d 235, 239 (R.I. 2004)). However, if "porches" (found once) is construed to mean "decks," then the terms "deck" and "decks" (found throughout the Declaration, By-laws and 1979 Phase I Plans) would not be given their own meaning, in contradiction of this canon of construction.
In particular, "deck" means "[a] roofless, floored structure, typically with a railing, that adjoins a house" in this context.American Heritage Dictionary 471 (4th ed. 2000). Roget's International Thesaurus lists as synonyms for "deck" such terms as "ground covering," "floor," "platform," "stage," and "balcony."See Roget's InternationalThesaurus §§ 199.3 901.13. In contrast, "porch" is defined as "[a] covered platform, usually having a separate roof, at an entrance to a building." American Heritage Dictionary 1366. Synonyms for "porch" include "entrance," "threshold," "doorway," "stoop," and "veranda." See Roget's InternationalThesaurus §§ 189.6 197.21. "Deck" does not appear as a synonym of "porch" and "porch" does not appear as a synonym of "deck." Seeid. §§ 87.20, 189.6, 197.21, 199.3, 296.1, 703.9 758.2, 770.8, 901.13. Indeed, the definition that emerges is that a "porch" is a type of "deck" *Page 15 
that is covered by a roof at the entrance of a building. In this particular context, the porches of Moorland Farm are the covered entrances found in the entry court areas of the Phase I units. This area is also specifically identified as a "limited common area" — i.e. a specific type of common area — which is the responsibility of the individual unit owners under the Declaration. (See Joint Ex. 31 ¶ 37; Joint Ex. 1 § 5.) Thus, the decks are part of the individual condominium unit and are, consequently, the responsibility of the individual condominium owners. See id.
According to the By-laws, all unit owners share liability for common expenses and the Management Committee has the power to determine "the common expenses" and assess and collect "the common charges for the Unit Owners." (By-laws, Art. III § 1; By-laws Art. V § 1(a).) Likewise, under § 34-36-20(a), "it shall be the duty of every unit owner to pay his or her proportionate share of the common expenses. Payment shall be in amounts and at such times as determined by the management committee in accordance with the terms of the declaration or the bylaws." Sec. 34-36-20(a) (emphasis added). Therefore, the Management Committee of the Association was without authority to levy assessments on all unit owners for the repair, replacement or maintenance of the decks, pocket decks, and stairways of the entry court areas of the Phase I individual condominium units. (See Joint Ex. 1 § 5.)
 IV Conclusion
Based upon the foregoing findings of fact and conclusions of law, this Court finds that the decks in question are part of the individual condominium units. Likewise, the decks are neither a "common area" nor a "limited common area" owned in common by all condominium unit owners. Consequently, the four special assessments are illegal. The Defendant shall refund all assessments to all unit owners and re-assess the cost of the deck replacements (including *Page 16 
stairways of the entry court areas and pocket decks) to the Phase I individual unit owners whose decks and stairways/entryways of entry court areas were replaced or repaired.
Counsel shall prepare a judgment in accordance with this Decision.